IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

WELLINGTON MARTE RAMIREZ and  :
KELIANA MORONTA JIMENEZ        :
                              :
            Plaintiffs,        :    3:25-cv-00942
                              :    (JUDGE MARIANI)
      v.                      :
                              :
LUZERNE COUNTY, CITY OF        :
HAZLETON, DETECTIVE DAVID      :
RODICK, DETECTIVE MARIO HOWEY  :
and DETECTIVE CHARLES JENSEN   :
                              :
            Defendants.        :

## MEMORANDUM OPINION

In this malicious prosecution, false arrest, and false imprisonment civil rights action, Plaintiffs alleges that the Defendants violated their rights under the Fourth and Fourteenth Amendment to the United States Constitution by arresting, detaining (and continuing to detain) them for over 300 days without probable cause. Plaintiffs further claim that the Defendants initiated criminal proceedings against them on five charges, including criminal homicide and conspiracy to commit criminal homicide, all without probable cause. Plaintiffs were acquitted by jury of their peers on all charges after less than one hour of deliberations.

Presently before the Court is a motion to dismiss filed by Defendants City of Hazleton, Detective David Rodick and Detective Mario Howey pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. 9). The motion also seeks a more definite statement pursuant to Federal Rule of Civil Procedure 12(e) and further moves to strike certain

allegations in the Complaint pursuant to Federal Rule of Civil Procedure 12(f).  Defendants

Luzerne County and Detective Charles Jensen answered the Complaint and did not move

to dismiss.  For the reasons that follow, Defendants' motions will be denied.

## I.    INTRODUCTION & PROCEDURAL HISTORY

Plaintiffs Wellington Marte Ramirez and Keliana Moronta Jimenez ("Plaintiffs")

commenced this action by filing a Writ of Summons in the Court of Common Pleas of

Luzerne County on December 28, 2023.  (Doc. 1-2 at 49).  Following pre-complaint

discovery, on or about May 6, 2025, Plaintiffs filed the Complaint in the Court of Common

Pleas of Luzerne County against Defendants Luzerne County (the "Defendant County"), the

City of Hazleton (the "Defendant City"), and three detectives:  Detective David Rodick,

Detective Mario Howey, and Detective Charles Jensen (together, the "Individual

Defendants").  (Doc 1-2).

In the Complaint, Plaintiff brings five claims under federal and Pennsylvania law.  In

Count One, Plaintiffs bring a claim for malicious prosecution pursuant to 42 U.S.C. § 1983

against the Individual Defendants.  (*Id.* at 34-36).  In Count Two, Plaintiffs bring a claim for

malicious prosecution pursuant to 42 U.S.C. § 1983 against the Defendant City alleging

*Monell* liability.  (*Id.* at 36-39).  In Count Three, Plaintiffs bring a claim for malicious

prosecution pursuant to 42 U.S.C. § 1983 against the Defendant County alleging *Monell*

liability.  (*Id.*, 39-41).  In Count Four, Plaintiffs bring claims for False Arrest and False

Imprisonment pursuant to 42 U.S.C. § 1983 against the Individual Defendants.  (*Id.* at 42-

43).  Lastly, in Count Five, Plaintiffs bring a claim for malicious prosecution under

Pennsylvania law against the Individual Defendants.  (*Id.* at 43-45).

On May 28, 2025, Defendant Luzerne County and Detective Charles Jensen

removed the action to this Court.  (Doc. 1).  On July 7, 2025, Defendants City of Hazleton,

Detective David Rodick and Detective Mario Howey filed the instant motion to dismiss,

(Doc. 9), and attached certain documents to their brief in support.  (Docs. 13, 13-1).  The

following day, Defendants Luzerne County and Detective Charles Jensen filed their Answer

to the Complaint.  (Doc. 10).  The matter has been fully briefed and is ripe for disposition.[1]

## II.    FACTUAL ALLEGATIONS

Plaintiffs' Complaint contains 313 separate and detailed paragraphs and alleges the

following facts:

### *Nature of the Case*

In October 2022, Plaintiffs, Wellington Marte Ramirez and Keliana Moronta Jimenez,

were arrested without probable cause for crimes including conspiracy to commit homicide.

(Doc. 1-2, ¶ 1).  Mr. Marte and Ms. Moronta spent over three hundred days in jail for these

alleged crimes until a jury of their peers acquitted them of all charges after less than 45

minutes of deliberation.  (*Id.*).  The story of their prosecution, as revealed during the criminal

trial, is so egregious that, following the verdict, jurors went to the jail to see with their own

eyes that Mr. Marte and Ms. Moronta were actually released from custody.  (*Id.*).  The

---

[1]    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), and 1367(a).

unlawful arrests and malicious prosecutions of Mr. Marte and Ms. Moronta form the basis of this civil action. (*Id.*).

The unlawful charges against Mr. Marte and Ms. Moronta stemmed from a shooting on October 7, 2022, in Hazleton, Pennsylvania. (*Id.*). On that day, two individuals, Felix Dini and Rochelle Reyes-Cruz, were shot by individual known as "Jenndry." (*Id.*). Felix Dini succumbed to his injuries prior to regaining consciousness. (*Id.*). Defendant Rodick interviewed Reyes-Cruz on the day of the shooting and three days later. (*Id.*). Reyes-Cruz was known to investigators as a violent criminal who carried a gun and committed robberies. (*Id.*). On the night of the shooting, Reyes-Cruz told Defendant Rodick that Jenndry, Mr. Marte, and an individual named Luis were involved in the shooting. (*Id.*). Three days later, Reyes-Cruz told an elaborate tale to Defendant Rodick which took out Luis's iinvolvement and now included Ms. Moronta. (*Id.*). Defendant Rodick proceeded to base his entire investigation on Reyes-Cruz's second story, while never asking for the reason for the change or considering the truthfulness of this known violent criminal. (*Id.*).

The "investigation" after the shooting and murder lasted only three days. (*Id.*). During those three days, investigators from Defendant Hazleton City and Defendant Luzerne County, including Defendants Rodick, Howey, and Jensen, collected some physical evidence, obtained videos, and spoke to individuals in the neighborhood. (*Id.*). No physical evidence was tested. (*Id.*). No video footage of the shooting or the events immediately leading to the shooting was recovered. (*Id.*). No witnesses to the shooting itself, except

Reyes-Cruz, were interviewed. (*Id.*). At the conclusion of these three days, Defendants Rodick, Howey, and Jensen signed affidavits of probable cause as co-affiants which were used as the basis for the arrest warrants for Mr. Marte and Ms. Moronta. (*Id.*). The affidavits of probable cause included material misrepresentations that left the reader with the false impression that immediately after the shooting Reyes-Cruz gave a detailed account of the events, that this detailed story never changed three days later, and that the only individuals ever identified as being involved in the shooting were Jenndry, Ms. Moronta, and Mr. Marte. (*Id.*). Material omissions in the affidavits further perpetuated the false impression that probable cause exited to charge Mr. Marte and Ms. Moronta with crimes including conspiracy to commit criminal homicide. (*Id.*). Nowhere in the affidavits was there any mention of Reyes-Cruz's criminal history or his motivation to lie. (*Id.*). The affidavits also failed to mention that several eyewitnesses to the shooting were identified and investigators never attempted to interview these individuals. (*Id.*).

While Mr. Marte and Ms. Moronta sat in jail for months, Defendants Rodick, Jensen, and Howey ignored detailed identifying information for multiple eyewitnesses and continued to rely solely on the word of Reyes-Cruz. (*Id.*). As the story of Reyes-Cruz continued to change and/or be contradicted by the physical and testimonial evidence, Defendants Rodick, Jensen, and Howey persisted. (*Id.*). As the trial date approached and it was obvious that Reyes-Cruz's story about his positioning when he observed the material elements of the crime was physically impossible, Detective Rodick shared the video footage

of the events surrounding the shooting with him so that his trial testimony would match. (*Id.*).  During this time, Defendants Rodick, Howey, and Jensen also continued to consciously disregard the information they had about other eyewitnesses who would contradict the tale told by Reyes-Cruz.  (*Id.*).

Leading up to and throughout the trial, Defendants Rodick, Howey, and Jensen acted with reckless disregard for the truth despite their continuing duty to re-evaluate the evidence.  (*Id.*).  As it became clearer and clearer throughout the trial that Reyes-Cruz's story was fabricated, the prosecution continued and efforts were made to cover for the inaccuracies in Reyes-Cruz's story, as well as the intentional disregard for any meaningful investigation into the shooting and murder.  (*Id.*).  Following three days of trial, Mr. Marte and Ms. Moronta were finally acquitted and released from jail.  (*Id.*).  They were reunited with their families and three children, including their son who was born only twenty-five (25) days prior to his mother's arrest.  (*Id.*).  Mr. Marte and Ms. Moronta are now physically free; however, they continue to battle with the mental repercussions of their unlawful prosecution and incarceration.  (*Id.*).

*The Parties*

Plaintiffs are adult individuals residing in the Commonwealth of Pennsylvania.  (Doc. 1-2, ¶¶ 4-5).  Defendant Luzerne County a county in the Commonwealth of Pennsylvania. (*Id.*, ¶ 6).  Defendant City of Hazelton) is a municipality located in Luzerne County, Pennsylvania.  (*Id.*, ¶ 7).  Defendant David Rodick ("Defendant Rodick") was at all relevant

times employed by Defendant City as a detective.  (*Id.*, ¶ 8).  Defendant Mario Howey

("Defendant Howey") was at all relevant times employed by Defendant City as a detective.

(*Id.*, ¶ 9).  Defendant Charles Jensen ("Defendant Jensen") was at all relevant times

employed by Defendant County as a detective.  (*Id.*, ¶ 10).

## *The Shooting – October 7, 2022*

On October 7, 2022, at approximately 5:45 p.m., Felix Dini ("Dini") and Rochelle

Reyes-Cruz ("Reyes-Cruz") were shot on Noble Street in the area of South Wyoming Street

in Hazleton, Pennsylvania.  (*Id.*, ¶ 11).  Multiple reports of gunfire were called into Luzerne

County 911 and officers from Defendant City's Police Department responded to the scene.

(*Id.*, ¶ 12).  Defendant City's Police Department also received a call from Lehigh Valley

Hospital-Hazleton ("LVHH") that there was a gunshot victim at the hospital and police

assistance was needed.  (*Id.*, ¶ 13).  Patrolman Kevin Lantigua ("Patrolman Lantigua")

responded to LVHH and was informed that they were treating two gunshot victims, Dini and

Reyes-Cruz.  (*Id.*, ¶ 14).  Upon entry into the LVHH Emergency Department, Patrolman

Lantigua learned that Dini was in critical condition and had already been intubated.  (*Id.*, ¶

15).  At the time, Reyes-Cruz was stable.  (*Id.*, ¶ 16).  Patrolman Lantigua and Defendant

Rodick spoke to Reyes-Cruz about the shooting (the "First Interview").  (*Id.*, ¶ 17).

## *Reyes-Cruz Interviews (October 7, 2022 and October 10, 2022)*

During the First Interview, Reyes-Cruz told Patrolman Lantigua and Defendant

Rodick that a person named "Yendri" shot him and that "Luis Estevez" and "Wellington

Marte" were involved.  (*Id.*, ¶ 18). "Yendri" was later identified as Jenndry Samuel

Rodriguez-Contreras ("Jenndry").  (*Id.*, ¶ 19).  "Luis Estevez" was later identified as Luis

Estevez Peralta ("Luis").  (*Id.*, ¶ 20).  Mr. Marte was known to Defendant Rodick through an

earlier criminal prosecution.  (*Id.*, ¶ 21).  Three days later, on October 10, 2022, at about 4

a.m., Dini died as a result of his gunshot wounds.  (*Id.*, ¶ 22).  That same day, Defendant

Rodick went to the LVHH to conduct a second interview of Reyes-Cruz regarding the

shooting (the "Second Interview").  (*Id.*, ¶ 23).  Defendant Rodick knew Reyes-Cruz prior to

the shooting as he had investigated and prosecuted him for violent crimes.  (*Id.*, ¶ 24).  At

the time of this shooting, Defendant Rodick was prosecuting Reyes-Cruz for a crime in

which an individual was stabbed multiple times.  (*Id.*, ¶ 25).  Defendant Rodick knew that

Reyes-Cruz carried a gun regularly and had robbed people at gun point.  (*Id.*, ¶ 26).

Defendant Rodick knew that Reyes-Cruz had never cooperated with a criminal

investigation.  (*Id.*, ¶ 27).

The Second Interview was both audio and video recorded.  (*Id.*, ¶ 28).  During the

Second Interview, Reyes-Cruz completely changed the story he told to Patrolman Lantigua

and Defendant Rodick in the First Interview.  (*Id.*, ¶ 29).  Specifically, during the Second

Interview, Reyes-Cruz told Defendant Rodick that Mr. Marte instructed Jenndry to shoot Dini

and that Mr. Marte's girlfriend, Ms. Moronta, handed a gun to Jenndry.  (*Id.*, ¶ 30).  This was

the first time that Defendant Rodick heard Ms. Moronta's name as being involved in the

shooting and he reacted with surprise, stating "I didn't see that coming."  (*Id.*, ¶ 31).  Not

only did Reyes-Cruz's new story about the shooting include Ms. Moronta's involvement, it also took out any involvement by Luis. (*Id.*, ¶ 32). Although Reyes-Cruz indicated during the Second Interview that Luis was at the scene, he no longer claimed that Luis was involved in shooting Dini and himself. (*Id.*, ¶ 33). Defendant Rodick knew that, during the First Interview, Reyes-Cruz was named Luis as one of the individuals responsible for the shooting, but he chose not to ask Reyes-Cruz why his story changed. (*Id.*, ¶ 34).

During the Second Interview, Reyes-Cruz also provided a background story on how the shooting occurred. (*Id.*, ¶ 35). According to Reyes-Cruz, he and Dini were in the area of Noble Street and South Wyoming Streets to buy marijuana from a man who lived on the corner. (*Id.*, ¶ 36). Reyes-Cruz stated that he and Dini were traveling in the back seat of a gold Nissan Rouge (the "Nissan Rouge"). (*Id.*, ¶ 37). Reyes-Cruz explained that when he arrived in the area of Noble and South Wyoming Streets, he saw Mr. Marte standing on crutches. (*Id.*, ¶ 38). Mr. Marte was known to Reyes-Cruz and he considered him a friend. (*Id.*, ¶ 39). According to Reyes-Cruz, when Dini got out of the car, an individual named Madinson started fighting with Dini. (*Id.*, ¶ 40). Madinson's full name is Madinson Silverio ("Madinson"). (*Id.*, ¶ 41). Reyes-Cruz told Defendant Rodick that was when Mr. Marte instructed Jenndry to shoot Dini and Reyes-Cruz. (*Id.*, ¶ 42). Reyes-Cruz explained that was also when he saw Ms. Moronta grab a gun and pass it to Jenndry from inside a black Acura (the "Black Acura") where the two were sitting. (*Id.*, ¶ 43). Reyes-Cruz added that Jenndry then shot Dini and him multiple times with the gun. (*Id.*, ¶ 44). Before the interview

concluded, Reyes-Cruz told Defendant Rodick that there were about 15 witnesses to the shooting and provided information about some of the individual and their locations, including that most of them hang out in the area of South Wyoming and Noble Streets every day. (*Id.*, ¶ 45).

<u>Lack of Relevant Investigative Efforts (October 7, 2022 to October 12, 2022)</u>

Other than the interviews with Reyes-Cruz, Defendants conducted little to no investigation prior to seeking arrest warrants for Mr. Marte and Ms. Moronta. (*Id.*, ¶ 46). The night of the shooting, patrolmen from Defendant City's Police Department collected physical evidence at the scene, spoke to some neighbors who did not witness the shooting, and canvassed the area for video evidence. (*Id.*, ¶ 47). Using Defendant Hazleton's camera system, Patrolman Lantigua located the Nissan Rouge that dropped off Reyes-Cruz and Dini at LVHH and identified its owner. (*Id.*, ¶ 48). On October 10, 2022, Defendant Howey and Defendant Jensen interviewed the driver of the Nissan Rouge, Manuel Hiciano Rivera ("Manuel Hiciano"). (*Id.*, ¶ 49). Manuel Hiciano told Defendants Howey and Jensen that before the shooting he turned onto Noble Street from South Wyoming Street and turned around near an alley, when Dini and Reyes-Cruz exited the vehicle together. (*Id.*, ¶ 50). Manuel Hiciano then drove back in the direction of South Wyoming Street, pulling ahead and parking on the south side of Noble Street. (*Id.*, ¶ 51). He heard the gunshots, but did not see anything. (*Id.*). During this interview, Manuel Hiciano also stated that another

individual, Sandro Reyes, was in the vehicle with them before and after the shooting. (*Id.*, ¶ 52).

An interview with Sandro Reyes on October 10, 2022, confirmed that Sandro Reyes was in the vehicle with Manuel Hiciano when he turned the vehicle around and pulled over to park as gunfire started. (*Id.*, ¶ 53). Like Manuel Hiciano, Sandro Reyes did not see the shooting. (*Id.*, ¶ 54). According to Manuel Hiciano, after taking Dini and Reyes-Cruz to the hospital, he and Sandro Reyes went to his house where they cleaned out the interior of the Nissan Rouge. (*Id.*, ¶ 55).

Also on October 10, 2022, Defendant Howey along with other officers from Defendant City's Police Department returned to the area of the shooting to canvass for video evidence and witnesses. (*Id.*, ¶ 56). The officers spoke to more neighbors and located additional video footage of the area; however, they spoke to no eyewitnesses and retrieved no video of the shooting itself. (*Id.*, ¶ 57). One of the neighbors interviewed was not home at the time of the shooting, but was the owner of several vehicles parked at the scene, including a gray Infiniti that was splattered with blood (the "Infiniti"). (*Id.*, ¶ 58).

A separate interview with the man who usually drove the Infiniti, Emmanuel Estevez, revealed that his brother also operated one of the vehicles found at the scene. (*Id.*, ¶ 59). As documented in Defendant City's Incident Report Form (the "Hazleton Incident Report"), Emmaneul Estevez offered that his brother was not in the area and had nothing to do with the shooting, but his friends always hang out in the area. (*Id.*, ¶ 60). It was observed by

officers that Emmaneul Estevez began to "perspire with sweat" as he spoke to investigators about his brother. (*Id.*, ¶ 61). Luis is the brother of Emmaneul Estevez. (*Id.*, ¶ 62). This information was known by the Individual Defendants immediately following the Emmanuel Estevez interview. (*Id.*). No follow-up investigation into Emmanuel Estevez, his brother, his friends, or the truthfulness of the statements was ever completed. (*Id.*, ¶ 63). In fact, the Individual Defendants failed to follow up with any of the identified eyewitnesses to the shooting other than Reyes-Cruz. (*Id.*, ¶ 64). The Individual Defendants never attempted to interview the approximately 15 eyewitnesses who Reyes-Cruz placed at the scene. (*Id.*, ¶ 65). The Individual Defendants never attempted to interview Madinson or Luis, both of whom Reyes-Cruz said were at the scene and in the proximity of the shooting. (*Id.*, ¶ 66).

Prior to seeking arrest warrants for Mr. Marte and Ms. Moronta, the Individual Defendants had in their possession Luis's full name, date of birth, physical description, identifying markers, criminal history, address, and social security number. (*Id.*, ¶ 67). Throughout the investigation, the Individual Defendants also had a photo of Luis in their possession. (*Id.*, ¶ 68). In fact, only a few months prior to the shooting, Luis was being actively prosecuted for an unrelated crime by officers from Defendant City's Police Department. (*Id.*, ¶ 69). The Individual Defendants never made any attempt to speak to Luis either prior to the arrests of Mr. Marte and Ms. Montoya, or through the verdict in their criminal trial. (*Id.*, ¶ 70). During this entire period of time, Luis remained in the Hazleton area. (*Id.*, ¶ 71). From the night of the shooting through the trial of Mr. Marte and Ms.

Moronta, the Individual Defendants also had in their possession certain physical evidence, including blood swabs and bullet casings; however, no steps were taken to test this evidence prior to only days before trial when it was known that results would not available. (*Id.*, ¶ 72). No one from Defendant City or Defendant County, including the Individual Defendants, ever returned to the area of the shooting to canvass for witnesses or do any other form of investigation after October 10, 2022, only three days after Dini and Reyes-Cruz were shot. (*Id.*, ¶ 73).

<u>*Misrepresentations and Omissions in the Affidavits of Probable Cause*</u>

On or about October 12, 2022, the Individual Defendants, as co-affiants, signed two separate criminal complaints to initiate charges against Mr. Marte and Ms. Moronta in connection with the shooting on October 7, 2022, in Hazleton (the "Criminal Complaints"). (*Id.*, ¶ 74). Mr. Marte and Ms. Moronta were charged with one count each of criminal conspiracy to commit homicide; one count each of criminal solicitation to commit criminal homicide; an open count each of criminal homicide; one count each of aggravated assault—serious bodily injury; one count each of aggravated assault—deadly weapon; and one count each of recklessly endangering another person.[2] (*Id.*, ¶ 75).

---

[2]    These charges were amended prior to trial to include one count each of criminal conspiracy to criminal homicide; one count each of criminal solicitation to commit criminal homicide; one count each of murder of the first degree; one count each of murder of the third degree; one count each of aggravated assault—serious bodily injury; and one count each of aggravated assault—deadly weapon. (Doc. 1-2, ¶ 75 n.1).

On October 12, 2022, Defendant Rodick and Defendant Jensen prepared affidavits of probable cause used to support the Criminal Complaints that were signed by the Individual Defendants as co-affiants. (*Id.*, ¶ 76). The affidavit of probable cause for the charges against Mr. Marte and the affidavit of probable cause for the charges against Ms. Moronta (collectively, the "Affidavits of Probable Cause") were identical. (*Id.*, ¶ 77). In the Affidavits of Probable Cause, Defendant Rodick and Defendant Jensen made false statements, as well as omissions creating a falsehood, that were material to the finding of probable cause. (*Id.*, ¶ 78). Specifically, Defendant Rodick and Defendant Jensen knowingly made false statements about two separate interviews with Reyes-Cruz while he was in the hospital. The Affidavits of Probable Cause were as follows:

> On October 7th, 2022, at approximately 1748 hrs. I received notification from Det. Lt. William Gallagher that two gunshots victims had arrived at the Lehigh Valley Hazleton Hospital. I also received a phone call from Ptlm. Kevin Lantigua and Sgt. Joseph Babula indicating that two individuals had been shot.

> More specifically, the victims in this case were identified as Felix Dini and Rochell Angel Reyes-Cruz. Upon my arrival at the Lehigh Valley Hazleton Hospital investigators spoke with Ptlm. Lantigua and he stated that Felix Dini was unconscious and intubated. Felix Dini sustained multiple gunshot wounds to his torso and one of the bullets had struck him in the neck area. His condition was critical but stable. Felix Dini was then medivaced (sic) to the Lehigh Valley Hospital at Cedar Crest.

> Physicians, nurses and technicians were working on Rochell Angel Reyes-Cruz and investigators spoke with him. Rochell Angel Reyes-Cruz stated that he had gone to buy some weed or marijuana in the area of Wyoming and Noble Streets. He stated that when got out of the car an individual well known to him by the name of Wellington Marte directed another male to shoot him. This occurred after Felix Dini and a male identified and only referred to as "Yendri" were briefly arguing. Rochell Angel Reyes-Cruz stated that after Wellington Marte said to shoot them, that a female named Keliana Moronta Jiminez gave the male identified as "Yendri" a gun. The gun was

described as having been in the front passenger's area of a black in color Acura TL. "Yendri" then shot both Felix Dini and Rochelle Angel Reyes-Cruz multiple times.

While at the hospital, Rochell Angel Reyes-Cruz asked for his cell phone because he would be able to show investigations a photographic image of the person who had shot him. He was able to show myself and Ptlm. Lantigua an image of the male named "Yendri."

During the time that were speaking to Rochell Angel Reyes-Cruz, his condition began to decline. A short while later he too was medivaced (sic) to the Lehigh Valley Hospital in Cedar Crest.

In the days after the shooting, Felix Dini remained in extremely critical condition. In addition, Rochell Angel Reyes-Cruz remained critical but more stable in his condition. Both men required several surgeries to repair the damage to their body's from the gunshot wounds.

On Sunday morning, October 10th, 2022 [sic], Felix Dini began to decompensate. On Monday morning, October 10th, 2022 at 0418 hours, Investigators received a phone call from the Lehigh County coroner. The corner advised that it was the case that Felix Dini had minutes earlier died.

On Monday, October 9th, 2022, at approximately 1132 hours, Rochell Angel Reyes-Cruz was shown an eight person photographic lineup. He had identified Wellington Marte by name as the person who called out, "grab the gun and shoot them." Wellington Marte's image was included in this aforementioned line-up. In addition, he identified Keliana Moronta-Jimenez as the person who retrieved the gun from the front of the car. She is also the girlfriend of Wellington Marte. He also confirmed that the shooter is known as "Yendri" and that he is illegal and only in this country for approximately five months. He added that the shooter lives with Wellington Marte.

Based on the above facts and affirmation, I Det. Sgt. David Rodick, respectfully request a warrant be issued for Keliana Moronta-Jimenez [Wellington Marte][3] for the charges listed herein in this criminal complaint.

Due to the nature of this investigation, your affiant(s) and Jarrett Ferentino, Assistant District Attorney, respectfully requests that this affidavit be sealed to preserve the

---

[3]    "The individual's name was inserted in the appropriate affidavit of probable cause." (Doc. 1-2, ¶ 80 n.2).

integrity of the investigation and in order to prevent tipping-off eyewitnesses to the event. Investigators have information to believe that the Defendant knows some of the eyewitnesses personally as well as associates and friends of the eyewitnesses. Sealing is also requested to protect the victim who remains at a hospital facility in physical conditions rendering them unable to defend themselves. Sealing is also necessary to protect society and law enforcement from further violent acts when the Defendant's apprehension is attempted.

(Doc. 1-2, ¶ 80).

In the Affidavits of Probable Cause, Defendant Rodick and Defendant Jensen lied about the timing of the statements made by Reyes-Cruz and left out those statements which tended to show an unreliability to Reyes-Cruz's account of events. (*Id.*, ¶ 81). After briefly describing the notifications police received about a shooting, the lies and omissions in the Affidavits of Probable Cause start. (*Id.*, ¶ 82). By paragraph three, Defendant Rodick and Defendant Jensen tell significant, material lies about the identifications of the individuals who Reyes-Cruz said were responsible for the shooting. (*Id.*, ¶ 83). Instead of accurately recording that during the First Interview immediately after the shooting Reyes-Cruz named Jendry, Luis, and Mr. Marte as being responsible, Defendant Rodick and Defendant Jensen falsely stated that immediately following the shooting Reyes-Cruz said that Mr. Marte instructed Jenndry to shoot and then Ms. Moronta passed Jenndry a gun. (*Id.*, ¶ 84). These statements were not made until the Second Interview. (*Id.*). In fact, Luis's name appears nowhere in the Affidavits of Probable Cause even though he was originally identified as being responsible for the shooting. (*Id.*, ¶ 85). Defendant Rodick and Defendant Jensen also falsely stated that on the night of the shooting Ms. Moronta was

identified as having a role when Ms. Moronta's name was never even mentioned until three days after the shooting. (*Id.*, ¶ 86). The Affidavits of Probable Cause in no way indicate that Reyes-Cruz told one story immediately following the shooting and then, three days later, completely changed this story and the individuals involved. (*Id.*, ¶ 87).

Defendant Rodick and Defendant Jensen also omitted from the Affidavits of Probable Cause that during the Second Interview Defendant Rodick never asked Reyes-Cruz why he originally said Luis was involved and then switched the third responsible party to Ms. Moronta. (*Id.*, ¶ 88). Defendant Rodick never stated that he was surprised to hear Reyes-Cruz's story that Ms. Moronta was involved, nor did he explain the reasons that he was surprised. (*Id.*, ¶ 89). Upon information and belief, Defendant Rodick's surprise stemmed from the lack of involvement by Ms. Moronta in any prior criminal investigation or prosecution. (*Id.*, ¶ 90). Further, Defendant Rodick and Defendant Jensen failed to identify Madinson, the individual who Reyes-Cruz stated was fighting with Dini prior to the shooting. (*Id.*, ¶ 91). Instead, Defendant Rodick and Defendant Jensen lied to make their version of events sound better, creating the false narrative that Jenndry was fighting with Dini before he shot him. (*Id.*, ¶ 92). Due to these lies, any reader of the Affidavits of Probable Cause is left with the false impression that Reyes-Cruz gave a detailed account of events immediately after he was shot, Reyes-Cruz never changed his story, and the only individuals ever identified by Reyes-Cruz were Jenndry, Mr. Marte, and Ms. Moronta. (*Id.*, ¶ 93).

Defendant Rodick and Defendant Jensen also omitted facts which call into question Reyes-Cruz's veracity, as well as his version of events. (*Id.*, ¶ 94). Reyes-Cruz's known violent criminal history appears nowhere in the Affidavits of Probable Cause. (*Id.*, ¶ 95). This violent history is relevant both to Reyes-Cruz's motivation to lie about the events surrounding the shooting, as well as his general reliability for truthfulness. (*Id.*, ¶ 96). Further, Defendant Rodick and Defendant Jensen omitted material facts regarding the identification of eyewitnesses and the failure to attempt to speak with any of them. (*Id.*, ¶ 97). Defendant Rodick and Defendant Jensen failed to mention that information about eyewitnesses was provided by Reyes-Cruz and that no attempts to speak to these witnesses were made, even though Reyes-Cruz's account of events had serious indicia of unreliability. (*Id.*, ¶ 98).

On October 12, 2022, the Individual Defendants, as co-affiants, signed applications for arrest warrants for both Mr. Marte and Ms. Moronta, swearing that the information presented was true. (*Id.*, ¶ 99). The basis for the warrant application were the Affidavits of Probable Cause and the Criminal Complaints filed against Mr. Marte and Ms. Moronta. (*Id.*, ¶ 100). Based on the material misrepresentations and omissions of the Individual Defendants in the application for arrest warrants, the Honorable Michael T. Vough of the Luzerne County Court of Common Pleas issued warrants for the arrest of Mr. Marte and Ms. Moronta. (*Id.*, ¶ 101). On October 18, 2022, Ms. Moronta was taken into custody during a traffic stop in the Black Acura. (*Id.*, ¶ 102). She was committed to the Luzerne County

Correctional Facility without bail. (*Id.*). Following Ms. Moronta's arrest, Mr. Marte learned

for the first time that there was a warrant for his arrest in connection with the shooting. (*Id.*,

¶ 103). Through his counsel, Mr. Marte arranged to turn himself in to Defendant Rodick on

October 19, 2022. (*Id.*, ¶ 104). He was committed to the Luzerne County Correctional

Facility without bail. (*Id.*).

### *Individual Defendant's Continued Refusal to Contact Any of the Eyewitnesses*

Following the arrests of Mr. Marte and Ms. Moronta, Defendants continued to ignore

information about eyewitnesses and refused to even attempt to interview any of those

individuals. (*Id.*, ¶ 105). Upon her arrest, Ms. Moronta gave a lengthy recorded statement

to Defendant Rodick. (*Id.*, ¶ 106). During the interview, Defendant Rodick told Ms. Moronta

that he needed to interview everyone who was there when he had no intention of doing so.

(*Id.*, ¶ 107). In her statement, Ms. Moronta identified multiple individuals who were present

and witnessed the shooting. (*Id.*, ¶ 108). Ms. Moronta identified Madinson and another

friend, Stanley, as being with Mr. Marte during the shooting. (*Id.*, ¶ 109). Ms. Moronta

added that she believed Stanely was driving the Black Acura when it left the scene because

he later returned the vehicle to her. (*Id.*, ¶ 110). Stanley's full name is Stanley A. Sabatel

("Stanley"). (*Id.*, ¶ 111). At the time of the shooting, he was out on bail for drug trafficking

charges filed by Defendant City's Police Department. (*Id.*, ¶ 112). During the investigation

of the shooting, the Individual Defendants had Stanley's identifying information, including,

but not limited to, his photo, data of birth, and address. (*Id.*, ¶ 113). The Individual

Defendants never made any attempt to speak to Stanley. (*Id.*, ¶ 114). The Individual Defendants never made any attempt to speak to Madinson. (*Id.*, ¶ 115).

Ms. Moronta explained that she was in her friend's vehicle, a white Honda (the "White Honda") parked in the area of the shooting when they saw a man dressed in black come out of the alley, pull a gun, and start shooting. (*Id.*, ¶ 116). She identified the man shooting as Jenndry. (*Id.*). Ms. Moronta stated that she left with her friend in the White Honda after shots were fired. (*Id.*, ¶ 117). Video footage recovered by Defendants confirm that a White Honda in fact left the scene after the shooting. (*Id.*, ¶ 118). Ms. Moronta provided the name of her friend, Radhaluz, and offered to put Defendant Rodick in touch with her. (*Id.*, ¶ 119). Defendant Rodick never took Ms. Moronta up on this offer. (*Id.*). Radhaluz's full name is Radhaluz Cordero Rodriguez ("Radhaluz"). (*Id.*, ¶ 120). As of October 20, 2022, the Individual Defendants had in their possession a PENNDOT search for Radhaluz Cordero Rodriguez which included her photograph, address, date of birth, and physical description. (*Id.*, ¶ 121). The Individual Defendants also had in their possession a search from the Pennsylvania Bureau of Motor Vehicles identifying Radhaluz as the owner of the White Honda. (*Id.*, ¶ 122). The Individual Defendants never made any attempt to speak to Radhaluz about the shooting. (*Id.*, ¶ 123).

According to Defendant Rodick's own reports, during a hearing on November 18, 2022, defense counsel for Mr. Marte and Ms. Moronta told Defendant Rodick that he had interviewed approximately 18 eyewitnesses to the shooting and that their accounts

contradicted the Affidavits of Probable Cause. (*Id.*, ¶ 124). Defense counsel and

Defendant Rodick agreed that they would work together to coordinate police interviews for

these witnesses. (*Id.*, ¶ 125). Defendant Rodick documented in the Hazleton Incident

Report that he would "endeavor to start this process next week." (*Id.*, ¶ 126). Defendant

Rodick never spoke to counsel for Mr. Marte and Ms. Moronta again about the names of the

eyewitnesses or a schedule for their interviews. (*Id.*, ¶ 127).

*Preliminary Hearing and Reyes-Cruz's Contradicted Story (December 2, 2022)*

On December 2, 2022, a joint preliminary hearing was held for both Mr. Marte and

Ms. Moronta at the Luzerne County Courthouse (the "Preliminary Hearing"). (*Id.*, ¶ 128).

Prior to the Preliminary Hearing, counsel for Mr. Marte and Ms. Moronta played for

Defendant County's prosecutors recordings of Reyes-Cruz days before the shooting

threatening certain individuals previously identified as being present at the time of the

shooting. (*Id.*, ¶ 129). During his testimony at the Preliminary Hearing, Reyes-Cruz denied

having threated anyone prior to the shooting. (*Id.*, ¶ 130). Still, the Individual Defendants

ignored these lies, continued with Reyes-Cruz's false narrative and consciously chose not to

speak to the many individuals identified as eyewitnesses. (*Id.*, ¶ 131).

During his testimony, Reyes-Cruz also made multiple, material statements that were

contradicted by the physical evidence, as well as the limited testimonial evidence that had

been gathered. (*Id.*, ¶ 132). Reyes-Cruz stated that, upon their arrival, Manuel Hiciano

parked the Nissan Rogue on the right side of Noble Street past the Black Acura and

towards Pine Street.  (*Id.*, ¶ 133).  Pine Street intersects Noble Street north of the South

Wyoming Street intersection.  (*Id.*, ¶ 134).  This testimony was contradicted by the

statements of Manuel Hiciano and Sandro Reyes, as well as video footage, showing that

the Nissan Rouge turned around and parked at the opposite end of Noble Street closest to

South Wyoming Street.  (*Id.*, ¶ 135).  Reyes-Cruz also said he waited in the parked Nissan

Rouge for about five minutes after Dini exited before getting out himself to see what

happened.  (*Id.*, ¶ 136).  This statement is in direct contradiction to the statements of

Manuel Hiciano and Sandro Reyes who both said that Dini and Reyes-Cruz were out of the

Nissan Rouge before they parked, calling further in to question what Dini and Reyes-Cruz

were doing before the shooting started.  (*Id.*, ¶ 137).

 During his testimony, Reyes-Cruz described exiting the Nissan Rouge and walking

back down Noble Street towards Wyoming Street to the Black Acura.  (*Id.*, ¶ 138).

According to Reyes-Cruz's testimony, the Black Acura was parked on the right side facing

Wyoming Street, so he reached the area of the vehicle's trunk first.  (*Id.*, ¶ 139).  Reyes-

Cruz explained the front and back driver's side doors door of the Black Acura were open

which allowed him to see directly into the vehicle and observe Ms. Moronta pass a gun from

the front seat to Jenndry who was seated in the back.  (*Id.*, ¶ 140).  Reyes-Cruz testified

that Mr. Marte was standing near the drier's side door with a crutch and black device on his

leg when he told Ms. Moronta to grab the gun.  (*Id.*, ¶ 141).  Reyes-Cruz said that, after the

shooting, Mr. Marte jumped in the driver's seat and drove the Black Acura in reverse up

Noble Street toward Pine Street. (*Id.*, ¶ 142). At the time of this testimony, the Individual

Defendants knew that video footage directly contradicted Reyes-Cruz's testimony about the

location of the Black Acura and that its trunk was facing Pine Street. (*Id.*, ¶ 143). In fact, as

reflected in the video footage in the possession of the Individual Defendants, the Black

Acura was parked on Noble Street facing Pine Street which means as Reyes-Cruz

approached, he reached the front of the vehicle first, not the trunk. (*Id.*, ¶ 144). At this

approach and with the vehicle doors open, it would have been physically impossible for

Reyes-Cruz to see directly inside. (*Id.*, ¶ 145). The video evidence places Reyes-Cruz in a

position where he would have been unable to see an essential element of the crimes as

charged, Ms. Moronta passing a gun to Jenndry. (*Id.*, ¶ 146).

The Individual Defendants also knew that Mr. Marte was incapable of driving the

Black Acura on the night of the shooting. (*Id.*, ¶ 147). Mr. Marte had knee surgery prior to

the shooting and his right leg was still immobilized in a brace when he turned himself in to

authorities on October 19, 2022. (*Id.*, ¶ 148). Knowing the physical evidence contradicted

Reyes-Cruz's story in many ways, including on the essential elements of the crimes

charged, Defendants still followed the word of Reyes-Cruz only and made no efforts to

contact the witnesses known to have been present at the time of the shooting. (*Id.*, ¶ 149).

Many of the eyewitnesses were actually in the courtroom during the Preliminary Hearing.

(*Id.*, ¶ 150). During the proceedings, Reyes-Cruz identified multiple eyewitnesses to

Defendant Rodick. (*Id.*, ¶ 151). The Individual Defendants never spoke to any of these eyewitnesses. (*Id.*, ¶ 152).

### The Weeks Leading to Trial: Defendants' Continued Failure to Investigate

By Order dated June 6, 2023, the Honorable David W. Lupas scheduled the jury trial of Mr. Marte and Ms. Moronta to commence on August 14, 2023. (*Id.*, ¶ 153). With the jury trial scheduled only two months away, the Individual Defendants continued to consciously disregard the physical impossibilities of Mr. Reyes-Cruz's story and ignored the information they had about the many eyewitnesses to the shooting. (*Id.*, ¶ 154). Indeed, the only eyewitnesses contacted during this time period were Cesar Hiciano, one of the individuals in the Nissan Rogue with Reyes-Cruz and Dini. (*Id.*, ¶ 155). The Individual Defendants were aware of Cesar Hiciano's involvement immediately after the shooting. (*Id.*, ¶ 156). While they did request an interview with him at that time, the Individual Defendants never followed up after Cesar Hiciano initially indicated that he did not want to be involved. (*Id.*, ¶ 157). Instead, a few weeks before trial, Defendant Rodick took investigators from the Pennsylvania Attorney General's Office, as well as Defendant County's District Attorney's Office, to Cesar Hiciano's house to discuss an investigation into straw purchases of illegal firearms. (*Id.*, ¶ 158). At the time, Defendant Rodick told Cesar Hiciano that he was the target of the investigation and impressed upon him the seriousness of the charges. (*Id.*, ¶ 159).

Defendant Rodick returned to Cesar Hiciano's home only three days before the start of Mr. Marte and Ms. Moronta's trial to interview him about the shooting. (*Id.*, ¶ 160). During the course of the interview, Defendant Rodick turned off his body camera to tell Cesar Hiciano that there were problems with the straw gun purchases investigation and that, if he testified for the Commonwealth at Mr. Marte and Ms. Moronta's trial, then Defendant Rodick would help him in the gun investigation. (*Id.*, ¶ 161). Cesar Hiciano testified on behalf of the Commonwealth at Mr. Marte and Ms. Moronta's jury trial; however, his testimony about where the shooter got the gun completely contradicted the tale told by Reyes-Cruz as Cesar Hiciano indicated that the shooter pulled a gun from his waistband. (*Id.*, ¶ 162). On August 30, 2023, only 15 days after his testimony, Cesar Hiciano was arrested and charged with 63 counts related to the illegal purchase of firearms. (*Id.*, ¶ 163). Defendant Rodick never revealed to defense counsel for Mr. Marte and Ms. Moronta the offer of favorable treatment in the imminent gun case in exchange for Cesar Hiciano's trial testimony. (*Id.*, ¶ 164). The Individual Defendants contacted no additional eyewitnesses prior to trial even though they had identifying information for several of them. (*Id.*, ¶ 165). The only other actions by the Individual Defendants came in the days before trial and actually interfered with Mr. Marte and Ms. Moronta's efforts to expose the truth. (*Id.*, ¶ 166).

At the beginning of August 2023, counsel for Mr. Marte and Ms. Moronta contacted Defendant Rodick to ask for DNA testing on the nine bullet shell casings that were recovered from the scene of the shooting. (*Id.*, ¶ 167). The evidence would be used to

show who loaded the gun that shot Reyes-Cruz and Dini, particularly, that it was not Mr. Marte and it was not his gun.  (*Id.*, ¶ 168).  Many months prior, in November 2022, Defendant Rodick first spoke to the Pennsylvania State Police about conducting DNA testing on the shell casings.  (*Id.*, ¶ 169).  Nothing was done at that time.  (*Id.*, ¶ 170).  Defendant Rodick later indicated that the matter simply "fell by the wayside."  (*Id.*).  Upon counsel's request for testing, Defendant Rodick finally contacted Bode Labs for information about DNA testing on the shell casings.  (*Id.*, ¶ 171).  Bode Labs had a 12 to 14 week wait time for results on this type of testing.  (*Id.*, ¶ 172).  Counsel for Mr. Marte and Ms. Moronta offered the name of another lab to conduct the DNA testing which would return the results within three days.  (*Id.*, ¶ 173).

On August 7, 2023, Defendant Rodick sent the shell casings away to Bode Labs. (*Id.*, ¶ 174).  At the time that Defendant Rodick sent the casings to Bode Labs, he knew that trial was starting on August 14, 2023, and that the Commonwealth's final request for a continuance had been denied.  (*Id.*, ¶ 175).  At the time that Defendant Rodick sent the casings to Bode Labs, he knew that the results would not be returned for 12 to 14 weeks. (*Id.*, ¶ 176).  As a result of Defendant Rodick's actions, Mr. Marte and Ms. Moronta were deprived of the use of this potentially exonerating evidence at trial.  (*Id.*, ¶ 177). Additionally, since October 19, 2022, the Individual Defendants had in their possession a cell phone recovered from the glove box of the Infiniti with a jewelry receipt next it bearing the full name of Jenndry.  (*Id.*, ¶ 178).  The phone was presumed to be owned by Jenndry;

however, the Individual Defendants never sought a warrant to search the phone or extract

information from it. (*Id.*, 179). The blood on the Infiniti was also never tested. (*Id.*, ¶ 180).

*The Jury Trial (August 15, 2023 to August 18, 2023)*

Following jury selection, the trial of Mr. Marte and Ms. Moronta commenced on

August 15, 2023 (the "Jury Trial"). (*Id.*, ¶ 181). Reyes-Cruz testified first, stating many

factual inaccuracies that prosecutors from Defendant County attempted to cover by either

suggesting the correct answer to Reyes-Cruz, or even going as far as suggesting to the jury

that Reyes-Cruz may be color blind or confused by the English language. (*Id.*, ¶ 182).

Further, Reyes-Cruz directly changed portions of his testimony from the Preliminary Hearing

to match the testimonial and physical evidence in the case. (*Id.*, ¶ 183). Reyes-Cruz also

attempted to clear up some of the lies in his Preliminary Hearing testimony which were

directly refuted by video evidence. (*Id.*, ¶ 184). All of Reyes-Cruz's corrections to his

testimony were based on his review of the video footage with Defendant Rodick, rather than

his independent recollection. (*Id.*, ¶ 185). One day before jury selection, Defendant Rodick

showed Reyes-Cruz the video footage for the first time. (*Id.*, ¶ 186). Reyes-Cruz

subsequently changed portions of his testimony to match what he saw in the video. (*Id.*, ¶

187). At times, Reyes-Cruz even testified directly about actions he observed in the video

footage as though he personally saw it occur on the night of the shooting, even though it

would have been impossible for him to do so. (*Id.*, ¶ 188).

During the Jury Trial, Reyes-Cruz again testified to facts that were physically impossible related to the essential elements of the crimes charged. (*Id.*, ¶ 189). Reyes-Cruz told the same story from the Preliminary Hearing about approaching the Black Acura from behind with the doors open, allowing him to hear Mr. Marte order the shooting and see clearly Ms. Moronta pass a gun to Jenndry. (*Id.*, ¶ 190). The Individual Defendants knew that Reyes-Cruz's story about approaching the Black Acura from behind was physically impossible based on the video evidence in the case which showed the Black Acura facing Pine Street and the directions from where Reyes-Cruz approached. (*Id.*, ¶ 191). During his testimony at the Preliminary Hearing, Reyes-Cruz made up a story about the Black Acura reversing up Noble Street toward Pine Street, so that his approach at the back of the Black Acura made sense. (*Id.*, ¶ 192). After reviewing the video evidence with Defendant Rodick which showed that the Black Acura did not reverse up the street, Reyes-Cruz changed this story to keep his approach from behind the Black Acura but added that the Black Acura turned around at some point before fleeing the scene facing forward towards Pine Street. (*Id.*, ¶ 193). The Individual Defendants knew that the video evidence showed the Black Acura never changed positions and that Reyes-Cruz's story about approaching the Black Acura from behind was fabricated. (*Id.*, ¶ 194). Reyes-Cruz testified again that Mr. Marte drove the Black Acura away from the scene, while the Individual Defendants knew that was impossible due to his leg being immobilized in a brace and still images of video of the

vehicle after the shooting showing that it was not Mr. Marte driving the Black Acura.  (*Id.*, ¶ 195).

At the start of the second day of the Jury Trial, prosecutors from Defendant County told counsel for Mr. Marte and Ms. Moronta that they received a response to the subpoena they sent to Meta for Dini's Instagram files (the "Dini Instagram Return").  (*Id.*, ¶ 196). Although the Individual Defendants knew that all of the actors involved in the shooting communicated primarily on Instagram, Defendant Rodick never sent a subpoena for the Instagram Accounts of Reyes-Cruz and Dini until August 2, 2023.  (*Id.*, ¶ 197).  The information from Reyes-Cruz's Instagram account was never returned prior to the end of the Jury Trial.  (*Id.*, ¶ 198).  The Dini Instagram Return consisted of 266 files in both English and Spanish.  (*Id.*, ¶ 199).  After admonishing Defendant County's prosecutors for waiting until the few weeks before the Jury Trial to investigate, the trial judge granted a one-day continuance for both sides to review the Dini Instagram Report.  (*Id.*, ¶ 200).

In direct contradiction to the testimony given by Reyes-Cruz on the first day of the Jury Trial about his peaceful intentions on the day of the shooting, the Dini Instagram Return revealed that days before the shooting Dini and Reyes-Cruz were attempting to purchase illegal guns, Dini threatened the life of Luis, and, on the day of shooting, Dini referenced Luis running to a block for protection, meaning Wyoming and Noble Streets. (*Id.*, ¶ 201).  Defendant Rodick did not review the Dini Instagram, rather, he relied on other investigators to show him certain portions they chose.  (*Id.*, ¶ 202).

Following the one-day continuance, Defendant Rodick provided testimony about his investigation for the first time. (*Id.*, ¶ 203). During his testimony, Defendant Rodick made several misrepresentations about his investigation in an effort to mislead the jury and secure convictions. (*Id.*, ¶ 204). Examples of the lies Defendant Rodick told to mislead the jury are as follows:

- *Defendant Rodick made several attempts to locate Luis and speak with him.* In reality, no attempts were made by anyone, including Defendant Rodick, to speak to Luis.

- *Luis was uncooperative with the investigation.* Again, no attempts were even made to speak to Luis.

- *Efforts were made to speak to other eyewitnesses in the case.* In truth, the only eyewitnesses the Individual Defendants ever spoke to were Reyes-Cruz and Cesar Hiciano. These two eyewitness accounts directly contradicted each other on a material element.

- *The other eyewitnesses would not cooperate with investigators.* Although the Individual Defendants had identifying information for multiple known eyewitnesses, no attempts were made to reach any of these individuals.

- *Reyes-Cruz was reluctant to tell investigators the names or contact information of the eyewitnesses.* Completely contrary to Defendant Rodick's lies, Reyes-Cruz offered this information multiple times, including during recorded interviews and testimony.

Further, the Individual Defendants were in possession of such information in the days and weeks following the shooting, but chose to contact no one.

- *Defendant Rodick did not know who Cesar Hiciano was until a few days before trial.* In fact, the Individual Defendants attempted to speak to Cesar Hiciano right after the shooting but he declined, Reyes-Cruz identified Cesar Hiciano at the Preliminary Hearing in December 2022, and Defendant Rodick went to Cesar Hiciano's home a few weeks before trial regarding a gun investigation.

- *There was no way to corroborate Reyes-Cruz's story about Mr. Marte driving the Black Acura away from the scene because the tint on the vehicle was too dark.* When confronted during the Jury Trial with a still from the video footage, Defendant Rodick was forced to admit that you could see directly into the vehicle and the person driving did not match Mr. Marte's description.

(*Id.*, ¶ 205(a)-(g)) (emphasis in original).

During his testimony, Defendant Rodick acknowledged that he has a continuing duty to evaluate and re-evaluate evidence in criminal cases. (*Id.*, ¶ 206). Defendant Rodick even told the jury that he had re-evaluated the evidence after the Dini Instagram Return, but the decision was made to continue to prosecute the charges simply because it was the third day of trial. (*Id.*, ¶ 207). After Defendant Rodick's testimony, the Commonwealth rested. (*Id.*, ¶ 208).

Mr. Marte and Ms. Moronta presented two of the eyewitnesses to testify. (*Id.*, ¶ 209). First, Radhaluz recounted the exact information she gave during a prior hearing in May 2023 about being in the White Honda with Keliana and seeing the shooter come out of the alley. (*Id.*, ¶ 210). The only other witness Mr. Marte and Ms. Moronta presented was Madinson, the individual identified by multiple witnesses as fighting with Dini immediately before the shooting. (*Id.*, ¶ 211). Since a few weeks after the shooting, the Individual Defendants were in possession of Madinson's photo, address, and other identifying information; however, they never bothered to speak to him. (*Id.*, ¶ 212).

Madinson explained to the jury that, upon arrival to Noble Street, Dini got out of a vehicle and started to fight with him. (*Id.*, ¶ 213). While Dini held Madinson in a headlock, the shooting started. (*Id.*, ¶ 214). Because of the way his head was down, Madinson could not see where the shooter came from. (*Id.*, ¶ 215). After the shooting started, Madinson saw that Jenndry was the shooter. (*Id.*, ¶ 216). Madinson confirmed that Keliana was in another vehicle with Radhaluz the whole time. (*Id.*, ¶ 217). Madinson never heard Mr. Marte instruct Jenndry to shoot, nor did he see Ms. Moronta pass a gun as she was not in the Black Acura at the time. (*Id.*, ¶ 218). Madinson left the scene in the Black Acura with Mr. Marte and Stanley, another eyewitness identified months prior to the Jury Trial, but whom Defendants never attempted to interview. (*Id.*, ¶ 219). Stanley was driving the Black Acura. (*Id.*, ¶ 220). Madinson also confirmed what the videos and everyone interviewed,

except Reyes-Cruz, said about the location of the Black Acura—it did not have to reverse up the street as it was already facing the direction of Pine Street. (*Id.*, ¶ 221).

After Madinson's testimony, Mr. Marte and Ms. Moronta rested their defense. (*Id.*, ¶ 222). On the morning of August 18, 2023, both sides gave their closing arguments. (*Id.*, ¶ 223). At 1:43 p.m. on August 18, 2023, the jury was excused from the courtroom to begin deliberations and eat lunch. (*Id.*, ¶ 224). Approximately 45 minutes later, the jury informed court staff that they reached a verdict. (*Id.*, ¶ 225). The jury acquitted both Mr. Marte and Ms. Moronta on all charges. (*Id.*, ¶ 226). After delivering the verdict, several jurors remained outside the courtroom to express their outrage at the Commonwealth and apologies to defense counsel for the way that Mr. Marte and Ms. Moronta were treated. (*Id.*, ¶ 227). Multiple jurors also went to the Luzerne County Correctional Facility where Mr. Marte and Ms. Moronta were being held to make sure that they were in fact released from prison. (*Id.*, ¶ 228).

## Over 300 Days Behind Bars

Upon their release, Mr. Marte and Ms. Moronta had been incarcerated at the Luzerne County Correction Facility for 303 and 304 days, respectively. (*Id.*, ¶ 229). During their incarcerations as a result of the unlawful actions of Defendants, Mr. Marte and Ms. Moronta left three small children behind. (*Id.*, ¶ 230). Twenty-five days prior to her incarceration, Ms. Moronta gave birth to a son she shared with Mr. Marte. (*Id.*, ¶ 231). At the time of her arrest, Ms. Moronta was still breast feeding her newborn child. (*Id.*, ¶ 232).

As a result of the unlawful and unconstitutional actions of Defendants, Ms. Moronta and Mr. Marte were torn away from their newborn child and missed the first ten months of his life. (*Id.*, ¶ 233). As a result of the unlawful and unconstitutional actions of Defendants, Ms. Moronta and Mr. Marte were deprived of crucial time to bond with their newborn child. (*Id.*, ¶ 234). Ms. Moronta and Mr. Marte's child did not even know his parents when they were finally released from the Luzerne County Correctional Facility over three hundred days later. (*Id.*, ¶ 235)

Following their release from jail, Ms. Moronta and Mr. Marte struggled to establish parental bonds with their child who only ever knew Ms. Moronta's parents as his caregivers. (*Id.*, ¶ 236). At the time of the arrests, Ms. Moronta also had a three-year-old daughter for whom Mr. Marte was an involved father figure. (*Id.*, ¶ 237). As a result of the unlawful and unconstitutional actions of Defendants, both Mr. Marte and Ms. Moronta were taken away from their young child for ten months of her life while she was cared for by her grandparents. (*Id.*, ¶ 238). Due to the young ages of both of these children, it was nearly impossible for Mr. Marte and Ms. Moronta to maintain significant connections or relationships with them through phone visits. (*Id.*, ¶ 239).

Prior to his arrest, Mr. Marte was also an involved father figure to the eight-year-old daughter of a former girlfriend. (*Id.*, ¶ 240). As a result of the unlawful and unconstitutional actions of Defendant, Mr. Marte was physically removed from her life. (*Id.*, ¶ 241). Before he was incarcerated, Mr. Marte spent time with his daughter multiple days per week. (*Id.*, ¶

242). During his incarceration, their relationship was reduced to twice weekly video phone calls. (*Id.*, ¶ 243). "As a result of the unlawful and unconstitutional actions of Defendants, Mr. Marte and Ms. Moronta sustained a loss of their freedom for over 300 days." (*Id.*, ¶ 244). "As a result of the unlawful and unconstitutional actions of Defendants, Mr. Marte and Ms. Moronta sustained a loss of everyday pleasures and the enjoyments of life." (*Id.*, ¶ 245). "As a result of the unlawful and unconstitutional actions of Defendants, Mr. Marte and Ms. Moronta suffered and continued to suffer mental distress and anguish." (*Id.*, ¶ 246).

*Count One – Malicious Prosecution against Defendant Rodick, Defendant Howey, and Defendant Jensen (the "Individual Defendants").*

'As co-affiants, the Individual Defendants caused criminal proceedings to be initiated against Plaintiffs, resulting in Plaintiffs' arrest, incarceration, and prosecution." (*Id.*, ¶ 248). "The Individual Defendants conspired with each other to initiate the criminal proceedings against Plaintiffs." (*Id.*, ¶ 249). "The crimes charged against both Plaintiffs were without probable cause." (*Id.*, ¶ 250). "The Individual Defendants caused the criminal proceedings to be prosecuted knowing the absence of probable cause." (*Id.*, ¶ 251). "The Individual Defendants made material misrepresentations in, and omitted material evidence from, the Affidavits of Probable Cause and applications for arrest warrants." (*Id.*, ¶ 252). "The Individual Defendants had obvious reasons to doubt the truth of Reyes-Cruz's statements and still asserted such material statements in the Affidavits of Probable Cause and applications for arrests warrants knowingly, intentionally, and/or with reckless disregard for the truth." (*Id.*, ¶ 253). "Knowingly, intentionally, and/or with reckless disregard for the truth,

the Individual Defendants made material omissions of facts which any reasonable person would know that a judge would want to know in reviewing the Affidavits of Probable Cause and applications for arrest warrants." (*Id.*, ¶ 254). "Throughout their investigation, the Individual Defendants were aware of reasonably discoverable information and/or information directly within their control bearing on probable cause; however, they chose to turn a blind eye and ignore all such information." (*Id.*, ¶ 255).

"Pleading in the alternative, if probable cause existed at the times of the issuance of the arrest warrants for Mr. Marte and Ms. Moronta, probable cause dissipated during the course of the investigation and through trial as the physical and testimonial evidence continually contradicted Reyes-Cruz, the sole witness to establish to elements of the crimes of as charged." (*Id.*, ¶ 256). "Following a trial by jury, Plaintiffs were acquitted on all criminal charges." (*Id.*, ¶ 257). "The Individual Defendants brought the criminal charges and continued the prosecution with malice or for a purpose other than bringing Plaintiffs to justice." (*Id.*, ¶ 258). "The initiation and prosecution of these criminal charges against Plaintiffs by the Individual Defendants proximately caused damages to Plaintiffs." (*Id.*, ¶ 259). "Plaintiffs were physically seized and incarcerated for over three hundred days as a result of the unlawful charges." (*Id.*, ¶ 260). "The conduct of the Individual Defendants was deprivation, under color of state law, of rights guaranteed to Plaintiffs under the Fourth and Fourteenth Amendments to the United States Constitution." (*Id.*, ¶ 261). "As a result of the

violation of Plaintiffs' constitutional rights by the Individual Defendants, Plaintiffs suffered substantial injuries and damages." (*Id.*, ¶ 262).

<u>Count Two: Malicious Prosecution (Monell) against Defendant City of Hazleton</u>

"Defendant City had policies, customs and/or practices that resulted in the violation of Plaintiffs' rights under the Fourth and Fourteenth Amendments." (*Id.*, ¶ 264). "Upon information and belief, Defendant City's Police Chief, Brian Schoonmaker ("Chief Schoonmaker") exercised complete control over the promulgation and enforcement of the policies for Defendant City's Police Department." (*Id.*, ¶ 265). "As the highest policymaker for Defendant City, Chief Schoonmaker's actions constituted Defendant City's policy for policing." (*Id.*, ¶ 266). "Upon information and belief, Chief Schoonmaker approved the filing of the Criminal Complaints, including the Affidavits of Probable Cause." (*Id.*, ¶ 267). "Upon information and belief, Chief Schoonmaker retained control to evaluate the conduct of the officers at Defendant City's Police Department." (*Id.*, ¶ 268). "Both Defendant Rodick and Defendant Howey were Chief Schoonmaker's subordinates whose actions were subject to review by him." (*Id.*, ¶ 269).

Based upon information and belief, and consistent with the unlawful prosecution of Mr. Marte and Ms. Moronta, as well as the complete failure of criminal investigation in their case, Defendant City had policies, practices, and/or customs related to the following:

- Omitting and/or mispresenting facts in affidavits of probable causes, thereby depriving the judicial reviewer of the opportunity to properly assess probable cause;

- Choosing not to interview eyewitnesses to a crime when such testimony may undermine probable cause;

- Failing to assess the credibility of witnesses/victims and adopting their interpretation of events as truth even where the physical evidence contradicts their version;

- Omitting facts about the credibility of a witness from affidavits of probable cause where such facts would undermine the veracity of the witness's statements;

- Failing to investigate crimes charged even when the information is readily accessible;

- Choosing to continue to prosecute crimes where there was no probable cause initially or any previously existing probable cause had dissipated;

- Taking steps to withhold evidence from criminal defense counsel and/or interfere with criminal defense counsel's access to evidence;

- Placing concerns about securing convictions over the constitutional rights of suspects and criminal defendants; and

- The failure to train its police personnel on probable cause to initiate criminal proceedings, the continuing obligation to evaluate the existence of probable cause, reliability of witnesses, and criminal investigations.

(*Id.*, ¶ 270(a)-(i)).

"Defendant city chose not to train to its police personnel, including Defendant Rodick and Defendant Howey on probable cause to initiate criminal proceedings, the continuing obligation to evaluate the existence or probable cause, reliability or witnesses, and criminal

investigations." (*Id.*, ¶ 271). "Defendant City should have trained its police personnel, including Defendant Rodick and Defendant Howey, on probable cause to initiate criminal proceedings, the continuing obligation to evaluate the existence of probable cause, reliability of witnesses, and criminal investigations." (*Id.*, ¶ 272). "Defendant City was deliberately indifferent to the fact that a violation of individual's constitutional right against unlawful seizure and unlawful criminal prosecution is a highly predictable consequence of its failure to train its police personnel, including Defendant Rodick and Defendant Howey, on probable cause to initiate criminal proceeds, the continuing obligation to evaluate the existence of probable cause, reliability of witnesses, and criminal investigations." (*Id.*, ¶ 273). "Defendant City's policies, customs, and/or practices directly caused and were the moving force behind the constitutional deprivations described above." (*Id.*, ¶ 274). "As a result of Defendant City's failure to train and illegal policies and customs, Mr. Marte and Ms. Moronta suffered serious injuries and damages." (*Id.*, ¶ 275). "Therefore, Defendant City violated the rights of Mr. Marte and Ms. Moronta under the Fourth and Fourteenth Amendments to the United States Constitutional." (*Id.*, ¶ 276).

*Count Three:  Malicious Prosecution (Monell) against Defendant Luzerne County*

"Defendant County had policies, customs, and/or practices that resulted in the violation of the Plaintiffs' rights under the Fourth and Fourteenth Amendments." (*Id.*, ¶ 278). "Defendant County's District Attorney, Samuel M. Sanguedolce ("District Attorney Sanguedolce") exercised complete control over the promulgation and enforcement of the

policies for Defendant County's District Attorney's Office, including its detectives." (*Id.*, ¶ 279). "As the highest policymaker for Defendant County's detectives, District Attorney Sanguedolce's actions constituted Defendant County's policy for policing." (*Id.*, ¶ 280). "District Attorney Sanguedolce approved the filing of the Criminal Complaints, including the Affidavits of Probable Cause." (*Id.*, ¶ 281). "District Attorney Sanguedolce retained control to evaluate the conduct of the detectives at Defendant County's District Attorney's Office." (*Id.*, ¶ 282). "Defendant Jensen was District Attorney's Sanguedolce's subordinate whose actions were subject to review by him." (*Id.*, ¶ 283). "District Attorney Sanguedolce approved the continued prosecution of Mr. Marte and Ms. Moronta by Defendant Jensen." (*Id.*, ¶ 284).

Based upon information and belief, and consistent with the unlawful prosecution of Mr. Marte and Ms. Moronta, as well as the complete failure of criminal investigation in their case, Defendant County had policies, practices, and/or customs related to the following:

- Omitting and/or mispresenting facts in affidavits of probable causes, thereby depriving the judicial reviewer of the opportunity to properly assess probable cause;

- Choosing not to interview eyewitnesses to a crime when such testimony may undermine probable cause;

- Failing to assess the credibility of witnesses/victims and adopting their interpretation of events as truth even where the physical evidence contradicts their version;

- Omitting facts about the credibility of a witness from affidavits of probable cause where such facts would undermine the veracity of the witness's statements;

- Failing to investigate crimes charged even when the information is readily accessible;

- Choosing to continue to prosecute crimes where there was no probable cause initially or any previously existing probable cause had dissipated;

- Taking steps to withhold evidence from criminal defense counsel and/or interfere with criminal defense counsel's access to evidence;

- Placing concerns about securing convictions over the constitutional rights of suspects and criminal defendants; and

- The failure to train its police personnel on probable cause to initiate criminal proceedings, the continuing obligation to evaluate the existence of probable cause, reliability of witnesses, and criminal investigations.

(*Id.*, ¶ 285(a)-(i)).

"Defendant County chose not to train its police personnel, including Defendant Jensen, on probable cause to initiate criminal proceedings, the continuing obligation to evaluate the existence of probable cause, reliability of witnesses, and criminal investigations." (*Id.*, ¶ 286). "Defendant County should have trained its police personnel, including Defendant Jensen, on probable cause to initiate criminal proceedings, the continuing obligation to evaluate the existence of probable cause, reliability of witnesses, and criminal investigators." (*Id.*, ¶ 287). "Defendant County was deliberately indifferent to

the fact that a violation of an individual's constitutional rights against unlawful seizure and unlawful criminal prosecution is a highly predictable consequence of its failure to train its police personnel, including Defendant Jensen, on probable cause to initiate criminal proceedings, the continuing obligation to evaluate the existence of probable cause, reliability of witnesses, and criminal investigations." (*Id.*, ¶ 288). "Defendant County's policies, customs, and/or practices directly caused and were the moving force behind the constitutional deprivations described above." (*Id.*, ¶ 289). "As a result of Defendant County's failure to train and illegal policies and customs, Mr. Marte and Ms. Moronta suffered serious injuries and damages." (*Id.*, ¶ 290). "Therefore, Defendant County violated the rights of Mr. Marte and Ms. Moronta under the Fourth and Fourteenth Amendments to the United States Constitution." (*Id.*, ¶ 291).

Count Four: False Arrest & False Imprisonment against the Individual Defendants.

"The Individual Defendants conspired with each other to initiate the criminal proceedings against, and arrest, Plaintiffs without probable cause." (*Id.*, ¶ 293). "The arrests and continued detainment of Mr. Marte and Ms. Moronta for a period exceeding three hundred days constituted an unreasonable seizure under the Fourth and Fourteenth Amendments to the United States Constitution." (*Id.*, ¶ 294). "The Individual Defendants made material misrepresentations in, and omitted material evidence from, the Affidavits of Probable Cause." (*Id.*, ¶ 295). "The Individual Defendants had obvious reason to doubt the truth of Reyes-Cruz's statements and still asserted such material statements in the

Affidavits of Probable Cause knowingly, intentionally, and/or with reckless disregard for the truth." (*Id.*, ¶ 296). "Knowingly, intentionally, and/or with reckless disregard for the truth, the Individual Defendants made material omissions of fact which any reasonable person would know that a judge would want to know in reviewing the Affidavits of Probable Cause." (*Id.*, ¶ 297). "The conduct of the Individual Defendants was a deprivation, under color of state law, of rights guaranteed to Plaintiffs under the Fourth and Fourteenth Amendments to the United States Constitution." (*Id.*, ¶ 298). "As a result of the violation of Plaintiffs' constitutional rights by the Individual Defendants, Plaintiffs suffered substantial injuries and damages." (*Id.*, ¶ 299). "Therefore, Defendants Rodick, Howey, and Jensen violated the rights of Mr. Marte and Ms. Moronta under the Fourth and Fourteenth Amendments to the United States Constitution." (*Id.*, ¶ 300).

*Count Five: Malicious Prosecution under Pennsylvania Law against the Individual Defendants.*

"As co-affiants, the Individual Defendants caused criminal proceedings to be initiated against Plaintiffs, resulting in Plaintiffs' arrest, incarceration, and prosecution." (*Id.*, ¶ 302). "The Individual Defendants conspired with each other to initiate the criminal proceedings against Plaintiffs." (*Id.*, ¶ 303). "The crimes charged against both Plaintiffs were without probable cause." (*Id.*, ¶ 304). "The Individual Defendants caused the criminal proceedings to be prosecuted knowing the absence of probable cause." (*Id.*, ¶ 305). "The Individual Defendants made material misrepresentations in, and omitted material evidence from, the Affidavits of Probable Cause." (*Id.*, ¶ 306). "The Individual Defendants had obvious reason

to doubt the truth of Reyes-Cruz's statements and still asserted such material statements in the Affidavits of Probable Cause knowingly, intentionally, and/or with reckless disregard for the truth." (*Id.*, ¶ 307). "Knowingly, intentionally, and/or with reckless disregard for the truth, the Individual Defendants made material omissions of facts which any reasonable person would know that a judge would want to know in reviewing the Affidavits of Probable Cause." (*Id.*, ¶ 308). 'Throughout their investigation, the Individual Defendants were aware of reasonably discoverable information and/or information directly within their control bearing on probable cause; however, they chose to turn a blind eye and ignore all such information." (*Id.*, ¶ 309).

"Pleading in the alternative, if probable cause existed at the time of the issuance of the arrests warrants for Mr. Marte and Ms. Moronta, probable cause dissipated during the course of the investigation and throughout trial as the physical and testimonial evidence continually contradicted Reyes-Cruz, the sole witness to establish to elements of the crimes as charged." (*Id.*, ¶ 310). "Following a trial by jury, Plaintiffs were acquitted of all criminal charges." (*Id.*, ¶ 311). "The Individual Defendants brought the criminal charges and continued the prosecution with malice or for a purpose other than bringing Plaintiffs to justice." (*Id.*, ¶ 312). "The initiation and prosecution of these criminal charges against Plaintiffs by the Individual Defendants proximately caused the damage the Plaintiffs." (*Id.*, ¶ 313).

### III.    STANDARD OF REVIEW

A complaint must be dismissed under Federal Rule of Civil Procedure 12(b)(6) if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555 (internal citations, alterations, and quotations marks omitted).  A court "take[s] as true all the factual allegations in the Complaint and the reasonable inferences that can be drawn from those facts, but . . . disregard[s] legal conclusions and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ethypharm S.A. France v. Abbott Labs.*, 707 F.3d 223, 231 n.14 (3d Cir. 2013) (internal citation, alteration, and quotation marks omitted).  Thus, "the presumption of truth attaches only to those allegations for which there is sufficient 'factual matter' to render them 'plausible on [their] face.'" *Schuchardt v. President of the U.S.*, 839 F.3d 336, 347 (3d Cir. 2016) (alteration in original) (quoting *Iqbal*, 556 U.S.

at 679). "Conclusory assertions of fact and legal conclusions are not entitled to the same presumption." *Id.*

"Although the plausibility standard 'does not impose a probability requirement,' it does require a pleading to show 'more than a sheer possibility that a defendant has acted unlawfully.'" *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal citation omitted) (first quoting *Twombly*, 550 U.S. at 556; then quoting *Iqbal*, 556 U.S. at 678). "The plausibility determination is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id.* at 786-87 (quoting *Iqbal*, 556 U.S. 679).

"As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997). However, an exception to this general rule exists where a "document *integral to or explicitly relied* upon in the complaint may be considered without converting the motion to dismiss into one for summary judgment." *Id.* (internal quotation marks and brackets omitted) (emphasis in original). The Court may also consider any "undisputedly authentic documents that a defendant attached as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *PBCG v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993). Nonetheless, consideration of these documents "only goes so far [and w]hen the truth of facts in an 'integral' document are contested by the well-

pleaded facts of a complaint, the facts in the complaint must prevail." *Doe v. Princeton Uni.*,

30 F.4th 335, 342 (3d Cir. 2022).

Rule 12(f) of the Federal Rules of Civil Procedure governs motions to strike

pleadings. It provides, in relevant part, "[t]he court may strike from a pleading an insufficient

defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P.

12(f). Rule 12(e), which governs motions for a more definite statement provides, in relevant

part:

> A party may move for a more definite statement of a pleading to which a responsive
> pleading is allowed but which is so vague or ambiguous that the party cannot
> reasonably prepare a response. The motion must be made before filing a responsive
> pleading and must point out the defects complained of and the details desired.

Fed. R. Civ. P. 12(e).

## IV.    ANALYSIS

Defendants City of Hazleton, Detective David Rodick, and Detective Mario Howey

move for dismissal of Plaintiffs' Complaint. (Doc. 9). First, Defendants argue that that

Plaintiffs' claim for malicious prosecution alleged in Count One must be dismissed because

any alleged misrepresentations and/or omissions from the Affidavits of Probable Cause

were not material to the finding of probable cause. (Doc. 13 at 12-24). Second,

Defendants seek dismissal of Count Two alleging malicious prosecution against the City of

Hazleton, claiming that the Complaint must be dismissed because it fails to sufficiently

allege a cause of action for *Monell* liability. (*Id.*, at 24-33). Third, Defendants move to

dismiss Plaintiffs' state law claim for malicious prosecution alleged in Count Five, asserting

that this claim is barred by Pennsylvania's Political Subdivision Tort Claims Act. (*Id.*, at 33-

36). Fourth, Defendant seeks dismissal of the malicious prosecution claim alleged in Count

One and the false arrest and false imprisonment claimed alleged in Count Four as to

Defendant Howey only. (*Id.*, at 36-38). Finally, Defendant move to strike Paragraph 1 of

the Complaint. (*Id.* at 38-39). Plaintiffs oppose Defendants' motion. (Doc. 17).

### A. The Complaint Plausibly Alleges That the Misrepresentations and Omissions from the Affidavits of Probable Cause Were Material to the Finding of Probable Cause.

Defendants seek dismissal of Count One alleging malicious prosecution against the

Individual Defendants. (Doc. 13 at 12-24). More specifically, Defendants assert that:

> [A]bsent the alleged misrepresentations and including the alleged omissions, probable cause still existed for issuance of the arrest warrants of Plaintiffs. Regardless of those alleged misrepresentations and omissions, at all times, the Commonwealth still possessed an eyewitness account from a victim pointing to Plaintiffs as guilty parties. That victim/witness had a motive to accurately relay the information related to the crime perpetrated against him not only to obtain justice but for his own safety—to remove the persons who had allegedly been involved in his shooting from the streets. Plaintiffs' claim for Malicious Prosecution must, therefore, be dismissed. Indeed, given the foregoing, all of Plaintiff's claims should be dismissed as probable cause existed for Plaintiffs' arrests. Contrary to Plaintiffs' assertion that Reyes-Cruz 'changed his story' regarding the shooting, the facts of the Complaint simply support that Luis was not involved in the second interview, three days later; the facts with respect to the shooting did not change but, instead, were developed further. The facts allegedly misrepresented by Defendants Rodick and Jensen, if anything, were not material to the determination of probable cause. However, even if they were included and/or corrected, they would not have changed the outcome that probable cause existed for the arrest of Plaintiffs' on the charges set forth in the Criminal Complaint.

(*Id.* at 19-20).

48

To state a claim under 42 U.S.C. § 1983, a plaintiff must show that the defendant, acting under color of state law, deprived him or her of a right secured by the Constitution or the laws of the United States. *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006). Section 1983 does not create any substantive rights but is merely a procedural vehicle through which an aggrieved party may bring a claim. *Id.* "A prima facie case under § 1983 requires a plaintiff to demonstrate: (1) a person deprived him of a federal right; and (2) the person who deprived him of that right acted under color of state or territorial law." *Groman v. Twp. of Manalapan*, 47 F.3d 628, 633 (3d Cir. 1995) (citing *Gomez v. Toledo*, 446 U.S. 635, 640 (1980)). Defendants do not dispute that they acted under color of state law.

To prevail on a malicious prosecution claim under § 1983, the plaintiff must establish that: "(1) the defendant initiated a criminal proceeding; (2) the criminal proceeding ended in [his or her] favor; (3) the defendant initiated the proceedings without probable cause; (4) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) [he or she] suffered deprivation of liberty consistent with concept of seizure as a consequence of the a legal proceeding." *Zimmerman v. Corbett*, 873 F.3d 414, 418 (3d Cir. 2017) (internal citation and quotation marks omitted); *see also Chiaverini v. City of Napoleon*, 602 U.S. 556, 558 (2024) (to succeed on a malicious prosecution claim under section 1983, "a plaintiff must show that a government official charged him without probable cause, leading to an unreasonable seizure of his person").

"The Fourth Amendment prohibits police from making an arrest except 'upon probable cause, supported by Oath or affirmation.'" *Dempsey v. Bucknell Uni.*, 834 F.3d 457, 467 (3d Cir. 2016) (quoting U.S. Const. amend. IV). "[P]robable cause to arrest exists when the facts and circumstances within the arresting officer's knowledge are sufficient in themselves to warrant to a reasonable person to believe than an offense has been or is being committed by the person to be arrested." *Orsatti v. New Jersey State Police*, 71 F.3d 480, 483 (3d Cir. 1995). Put differently, probable cause "exists whenever reasonably trustworthy information or circumstances within a police officer's knowledge are sufficient to warrant a person of reasonable caution to conclude that an offense has committed by the person being arrested." *United States v. Myers*, 308 F.3d 251, 255 (3d Cir. 2002). Probable cause "is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983).

Probable cause "does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction." *Adams v. Williams*, 407 U.S. 143, 149 (1972). Rather, the Court must look to the "totality of circumstances" to determine whether probable cause existed to initiate the criminal proceedings against the Plaintiffs. *Dempsey*, 834 F.3d at 467. The Third Circuit has held that "the question of probable cause in a section 1983 damage suit is one for jury." *Montogomery v. De Simone*, 159 F.3d 120 (3d Cir. 1998) (citing *Patzig v. O'Neil*, 577 F.2d 841, 848 (3d Cir. 1978)); *see*

also *Dempsey*, 834 F.3d at 468 (probable cause "is necessarily fact-intensive and it will usually be appropriate for a jury to determine whether probable cause existed") (citations omitted).

Omissions and assertions in affidavits of probable cause are treated differently under the law. Here, the Court must consider "first, whether the officer, with at least a reckless disregard for the truth, made false statements or omissions that created a falsehood in applying for a warrant, and second, whether those assertions or omissions were material, or necessary, to the finding of probable cause." *Andrews v. Sculli*, 853 F.3d 690, 697 (3d Cir. 2017) (internal citation and quotation marks omitted). A statement or assertion is made with reckless disregard for the truth where the affiant has "entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported." *Id.* at 698. "Misleading assertions can relate to even minor details, and do not need a separate determination of relevance. The focus in these instances is upon evidence demonstrating that the affiant willingly and affirmatively distorted the truth."[4] *Id.* (internal citation and quotation marks omitted).

---

[4]    The most serious offense with which Plaintiffs were charged was criminal homicide pursuant to 18 Pa. C.S.A. § 2501(a). "A person is guilty of criminal homicide if he intentionally, knowingly, recklessly or negligently causes the death of another human being." *Id.* Plaintiffs were also charged with conspiracy to commit criminal homicide in alleged violation of 18 Pa. C.S.A. § 903(a)(2), among other charges. "A person is guilty of conspiracy with another person or persons to commit a crime if with the intent of promoting or facilitating that crime he: agrees to aid such other person or persons in the planning or commission of such crime or of an attempt or solicitation to commit such crime." *Id.*

"Omissions are made with reckless disregard where an officer withholds a fact in his ken that any reasonable person would have known … was the kind of thing that the judge would wish to know." *Id.* (internal citation and quotation marks omitted). "When an officer submits a sworn affidavit of probable cause, he or she is not free to disregard plainly exculpatory evidence, even if substantial inculpatory evidence (standing by itself) suggests that probable cause exists." *Id.* at 699 (internal citation and quotation marks omitted). "Normally, to evaluate probable cause, we would ask whether a reasonable officer would have found a fair probability that there had been an [crime] and that [the plaintiff] had committed it."[5] *Pinkney v. Meadville, Pennsylvania*, 95 F.4th 743, 748 (3d Cir. 2024). "But when, as here, a judge issues an arrest warrant, we defer to it unless the officer misrepresentation material information to get the warrant." *Id.*

Defendants do not dispute that Plaintiffs have plausibly alleged omissions and misrepresentations made knowingly or with reckless disregard for the truth. They do, however, dispute whether these alleged omissions and misrepresentations "were 'material,

---

[5]    "An officer seeking a warrant on the basis of probable cause must follow a two-step process." *Dempsey*, 834 F.3d at 469. "First, the officer swears to an affidavit containing a summary of the events that she believes give rise to probable cause. In doing so, the officer is not free to disregard plainly exculpatory evidence, even if substantial inculpatory evidence (standing by itself) suggests that probable cause exists." *Id.* "Second, the officer presents the affidavit to a neutral magistrate, who conducts his own independent review of the evidence to determine whether it does, in fact, establish probable cause, and, if so, issues a warrant." *Id.* An "arrest warrant issued by a magistrate or judge does not, in itself, shelter an officer from liability." *Wilson*, 212 F.3d at 786. Indeed, where "the officer does not provide the neutral magistrate with an accurate affidavit of probable cause, the protection accorded by the magistrate's review is lost; the magistrate will be unable to assess the circumstances for probable cause because he will not know what those circumstances actually are." *Dempsey*, 834 F.3d at 479.

or necessary, to the finding of probable cause.'"[6]  *Wilson v. Russo*, 212 F.3d 781, 789 (3d

Cir. 2000) (quoting *Sherwood v. Mulvihill*, 113 F.3d 396, 399 (3d Cir. 1997)).  "To determine

the materiality of the misstatements and omissions, we excise the offending inaccuracies

and insert the facts recklessly omitted and then determine whether or not the corrected

warrant affidavit would establish probable cause."  *Id.*  The Court should consider those

"exculpatory facts, when weighed against the inculpatory facts" to determine when the

consideration of these facts is "enough to undermine a finding of probable cause."  *Id.* at

791-92.

Here, the Complaint plausibly alleges a series of misrepresentations and omissions

which, individually or taken together, are no doubt relevant to the probable cause

determination and something that "any reasonable person would know that a judge would

want to know."  *Wilson*, 212 F.3d at 783.  Moreover, the Complaint plausibly alleges the

---

[6]     "In *Wilson*, a police officer (Darrin Russo) claimed that probable cause for a warrant existed because an eyewitness (the owner of a floral shop that was robbed) positively identified Franklin Wilson from a photo array."  *Andrews*, 853 F.3d at 701.  "Russo excluded some exculpatory evidence."  *Id.*  The Third Circuit "decided that the exculpatory evidence Russo left out did not fatally undermine the eyewitness' positive identification and concluded that '[w]hen a police officer has received a ***reliable*** identification by a victim of his or her attacker, the police have probable cause.'"  *Id.* (quoting *Wilson*, 212 F.3d at 791) (emphasis added). "Nonetheless, stressing that probable cause requires an individualized analysis, we also said that '[i]ndependent exculpatory or substantial evidence of the witness's own unreliability that is known by the arresting officers could outweigh the identification such that probable cause would not exist.'"  *Id.* (quoting *Wilson*, 212 F.3d at 790).  Thus, "glaring discrepancies in a witness' testimony can undermine the reliability of an eyewitness who provides a positive identification."  *Id.* at 702.  "A lack of independent corroboration, alone, is not necessarily fatal to the reliability of a positive identification grounding probable cause in any given case.  However, having only one witnesses as the source of information about a crime and perpetrator does, logically, cast a brighter light on the body of evidence she or he provides.  In such cases, the significance of any consistency or discrepancy in the witness' evidence is enhanced because these are the only indicia of the witness' reliability that are available."  *Id.* at 704.

Individual Defendants "had obvious reasons to doubt the truth" of what they were told by Reyes-Cruz and further raises the reasonable inference that the Individual Defendants entertained serious doubts as to the truth of Reyes-Cruz statements.[7] *Id.*

As for the misrepresentations alleged Plaintiffs' Complaint:

First, Plaintiffs allege that "Defendant Rodick and Defendant Jensen knowingly made false statements about the two separate interviews with Reyes-Cruz while he was in the hospital." (Doc. 1-2, ¶ 79).

Second, Plaintiffs allege that "[i]nstead of accurately recording that during the First Interview immediately after the shooting Reyes-Cruz named Jenndry, Luis, and Mr. Marte as being responsible, Defendant Rodick and Defendant Jensen falsely stated that immediately following the shooting Reyes-Cruz said that Mr. Marte instructed Jenndry to shoot and then Ms. Moronta passed Jenndry a gun.  These statements were not made until the Second Interview."  (Doc. 1-2, ¶ 84).  "In fact, Luis's name appears nowhere in the Affidavits of Probable Cause even though he was originally identified as being responsible for the shooting."  (*Id.*, ¶ 85).

Third, Plaintiffs allege that "Defendant Rodick and Defendant Jensen also falsely stated that on the night of the shooting Ms. Moronta was identified as having a role when

---

[7]    In the alternative, Plaintiffs argue that even if there was probable cause to arrest and initiate criminal proceedings against them, that probable cause diminished over time because the Individual Defendants became aware of exculpatory facts after the arrest.  The Court need not address this issue at this time because neither party has briefed this issue, and Defendants did not seek dismissal on these grounds.

Ms. Moronta's name was never even mentioned until three days after the shooting."  (Doc. 1-2, ¶ 86).

Fourth, Plaintiffs alleged that the "Affidavits of Probable Cause in no way indicate that Reyes-Cruz told one story immediately following the shooting and then, three days later, completely changed the story and the individuals involved." (Doc. 1-2, ¶ 87).

The omissions alleged in the Plaintiffs Complaint are as follows:

First, "Defendant Rodick and Defendant Jensen also omitted from the Affidavits of Probable Cause that during the Second Interview Defendant Rodick never asked Reyes-Cruz why he originally said Luis was involved and then switched the third responsible party to Ms. Moronta."  (Doc. 1-2, ¶ 88).

Second, "Defendant Rodick and Defendant Jensen failed to identify Madinson, the individual who Reyes-Cruz stated was fighting with Dini prior to the shooting."  (Doc. 1-2, ¶ 91).  "Instead, Defendant Rodick and Defendant Jensen lied to make their version of events sound better, creating the false narrative that Jenndry was fighting with Dini before he shot him."  (*Id.*, ¶ 92).

Third, "Defendant Rodick and Defendant Jensen also omitted facts which calls into question Reyes-Cruz's veracity, as well as his version of events."  (Doc. 1-2, ¶ 94).  "Reyes-Cruz's known violent criminal history appears nowhere in the Affidavits of Probable Cause."  (*Id.*, ¶ 95).  "This violent history is relevant both to Reyes-Cruz motivation to lie about the

55

events surrounding the shooting, as well as his general reliability for truthfulness." (Doc. 1-2, ¶ 96).

Fourth, Plaintiffs allege that "Defendant Rodick and Defendant Jensey omitted material facts regarding the identification of eyewitnesses and the failure to attempt to speak with any of them." (Doc. 1-2, ¶ 97). "Defendant Rodick and Defendant Jensen failed to mention that information about eyewitnesses was provided by Reyes-Cruz and that no attempts to speak to these witnesses were ever made, even though Reyes-Cruz account of the events had serious indicia of unreliability." (Id., ¶ 98).

The Court must now reconstruct the Affidavits of Probable Cause by "excising the offending inaccuracies and inserting the facts recklessly omitted." Wilson, 212 F.3d at 789; see also Dempsey, 834 F.3d at 470 ("Where there are improperly omitted or included facts, we have previously instructed district courts to perform literal, word-by-word reconstructing of the challenged affidavits."). In the Complaint, Plaintiffs alleged that the Affidavits of Probable Causes were used to support the Criminal Complaint and arrest warrant were identical. (Doc. 1-2, ¶¶ 76-77, 99-101). Based on the facts alleged in the Complaint and accepting those allegations as true, the Court will reconstruct the Affidavits of Probable Cause as follows (with the omitted facts bolded and the misrepresentations struck out):

> On October 7th, 2022, at approximately 1748 hrs. I received notification from Det. Lt. William Gallagher that two gunshots victims had arrived at the Lehigh Valley Hazleton Hospital. I also received a phone call from Ptlm. Kevin Lantigua and Sgt. Joseph Babula indicating that two individuals had been shot.

More specifically, the victims in this case were identified as Felix Dini and Rochell Angel Reyes-Cruz.    Upon my arrival at the Lehigh Valley Hazleton Hospital investigators spoke with Ptlm. Lantigua and he stated that Felix Dini was unconscious and intubated.  Felix Dini sustained multiple gunshot wounds to his torso and one of the bullets had struck him in the neck area.  His condition was critical but stable.  Felix Dini was then medivaced (sic) to the Lehigh Valley Hospital at Cedar Crest.

Physicians, nurses and technicians were working on Rochell Angel Reyes-Cruz and investigators spoke with him.  Rochell Angel Reyes-Cruz stated that he had gone to buy some weed or marijuana in the area of Wyoming and Noble Streets.  **He stated at his first interview that person named "Yendri" shot him and that "Luis Estevez" and "Wellington Marte" were also involved.  Reyes-Cruz also identified a person known as Madinson as the person fighting with Dini prior to the shooting.**  ~~He stated that when got out of the car an individual well known to him by the name of Wellington Marte directed another male to shoot him.  This occurred after Felix Dini and a male identified and only referred to as "Yendri" were briefly arguing. Rochell Angel Reyes-Cruz stated that after Wellington Marte said to shoot them, that a female named Keliana Moronta Jiminez gave the male identified as "Yendri" a gun. The gun was described as having been in the front passenger's area of a black in color Acura TL.  "Yendri" then shot both Felix Dini and Rochelle Angel Reyes-Cruz multiple times.~~

While at the hospital, Rochell Angel Reyes-Cruz asked for his cell phone because he would be able to show investigations a photographic image of the person who had shot him.  He was to show myself and Ptlm. Lantigua an image of the male named "Yendri."

During the time that were speaking to Rochell Angel Reyes-Cruz, his condition began to decline.  A short while later he too was medivaced (sic) to the Lehigh Valley Hospital in Cedar Crest.

In the days after the shooting, Felix Dini remained in extremely critical condition.  In addition, Rochell Angel Reyes-Cruz remained critical but more stable in his condition. Both men required several surgeries to repair the damage to their body's from the gunshot wounds.

On Sunday morning, October 10th, 2022[8], Felix Dini began to decompensate.  On Monday morning, October 10th, 2022, at 0418 hours, Investigators received a phone call from the Lehigh County coroner. The corner advised that it was the case that Felix Dini had minutes earlier died.

On Monday, October 9th, 2022 at approximately 1132 hours, Rochell Angel Reyes-Cruz was **interviewed for the second time and was** shown an eight person photographic lineup.  **The second interview was both audio and video recorded. Reyes-Cruz stated that when got out of the car an individual well known to him by the name of Wellington Marte directed another male to shoot him.  This occurred after Felix Dini and a male identified and only referred to as "Yendri" were briefly arguing.  Rochell Angel Reyes-Cruz stated that after Wellington Marte said to shoot them, that a female named Keliana Moronta Jiminez gave the male identified as "Yendri" a gun.  The gun was described as having been in the front passenger's area of a black in color Acura TL.  "Yendri" then shot both Felix Dini and Rochell Angel Reyes-Cruz multiple times.**  He had identified Wellington Marte by name as the person who called out, "grab the gun and shoot them."  Wellington Marte's image was included in this aforementioned line-up.  In addition, he identified Keliana Moronta-Jimenez as the person who retrieved the gun from the front of the car.  She is also the girlfriend of Wellington Marte. He also confirmed that the shooter is known as "Yendri" and that he is illegal and only in this country for approximately five months.  He added that the shooter lives with Wellington Marte.  **Reyes-Cruz did not indicate why he originally identified Luiz as involved in the shooting and then changed to Ms. Moronta during the second interview.**

**During the second interview, Reyes-Cruz informed your affiants that there were approximately 15 witnesses to the shooting.  As of this date, your affiants have not interviewed any of these witnesses, nor have we obtained video footage from the crime scene.**

**Your affiants are familiar with Reyes-Cruz.   Prior to the shooting Reyes-Cruz had been investigated and prosecuted for multiple violent crimes.  At the time of the shooting, Reyes-Cruz was being prosecuted for a crime in which an individual was stabbed multiple times.  Your affiants also know that Reyes-Cruz regularly carries a gun, has committed robberies at gunpoint, and has never cooperated in a criminal investigation before.**

---

[8]    The Court notes that these dates contained in the Affidavits of Probable Cause cannot be correct. October 9, 2022, was on a Sunday and October 10, 2022, was on a Monday.

Based on the above facts and affirmation, I Det. Sgt. David Rodick, respectfully request a warrant be issued for Keliana Moronta-Jimenez [Wellington Marte][9] for the charges listed herein in this criminal complaint.

Due to the nature of this investigation, your affiant(s) and Jarrett Ferentino, Assistant District Attorney, respectfully requests that this affidavit be sealed to preserve the integrity of the investigation and in order to prevent tipping-off eyewitnesses to the event.  Investigators have information to believe that the Defendant knows some of the eyewitnesses personally as well as associates and friends of the eyewitnesses. Sealing is also requested to protect the victim who remains at a hospital facility in physical conditions rendering them unable to defend themselves.  Sealing is also necessary to protect society and law enforcement from further violent acts when the Defendant's apprehension is attempted.

(Doc. 1-2, ¶ 80); (Doc. 13-1 at 8-9).

In this matter, there can be no doubt that any reasonable person would think a judge would want to know that Reyes-Cruz was interviewed two times, told two different stories, and identified two different individuals involved in the shooting.  Any reasonable person would further think a judge would want to know that Reyes-Cruz first identified "Luiz," not Ms. Moronta, as a person involved in his shooting.  Similarly, the alleged issues with Reyes-Cruz credibility are something any reasonable person would think a judge would want to know.  It is true that the Court must "give an eyewitness identification significant weight," and the identification generally satisfies probable cause, "***unless it is unreliable or undermined by exculpatory evidence***."  *Pinkney*, 95 F.4th at 749 (emphasis added); *see*

---

[9]    The individual's name was inserted in the appropriate affidavit of probable cause.  (Doc. 1-2, ¶ 80 n.2).

*also Dempsey*, 834 F.3d at 477-78 ("In assessing whether the reconstructed affidavit establishes probable cause, we also must bear in mind our Circuit's rule that statements of a victim witness are typically sufficient to establish probable cause in the absence of independent exculpatory evidence or substantial evidence of a witness's own unreliability that outweighs the probable cause that otherwise exists.") (internal citations and quotation marks omitted).  Where, as here, "a witness is the sole source of information," Courts should "cast a brighter light on his account to ensure that it is reliable enough."[10]  *Pinkney*, 95 F.4th at 749 (internal citation and quotation marks omitted); *see also Wilson*, 212 F.3d at 787 ("It follows that a police officer cannot make unilateral decisions about the materiality of the information, or, after satisfying him or herself that probable cause exists, merely inform the magistrate or judge of inculpatory evidence.").

As alleged in the Complaint, the Court finds that the Individual Defendants made material malpresentations and material omissions that, based on the totality of the circumstances, undermine the finding of probable cause supporting the initiation of criminal proceedings against the Plaintiffs.  Further, Plaintiffs allege that Reyes-Cruz's identification is not reliable or corroborated, and the alleged misrepresentations and/or omissions made by the Individual Defendants were done knowingly or with reckless disregard for the truth. (Doc. 1-2, ¶¶ 79, 84-98).  As for Ms. Moronta, the Individual Defendants' misrepresentations

---

[10]    "An officer is not charged with conducting an independent investigation to verify statements made by a **credible** eyewitness if those statements provided him with probable cause to arrest."  *Vanderklok v. United States*, 140 F. Supp. 3d 373, 381 (E.D. Pa. 2015) (emphasis added), *aff'd* 774 Fed. App'x 73 (3d Cir. 2019).

and omissions were no doubt material to the determination of probable cause.  The same

can be said for Mr. Marte, although to a lesser extent.

In addition, because Reyes-Cruz's "identification was neither reliable nor

corroborated, it was not enough to show probable cause." *Pinkney*, 95 F.4th at 749.  "A

police officer may not put on blinders and then claim ignorance.  A single witness

identification, without more, must have at least basic signs of reliability to amount to

probable cause." *Pinkney*, 95 F.4th at 749.  Considering those "exculpatory facts, when

weighed against the inculpatory facts," *Wilson*, 212 F.3d at 791-92, the Court will deny

Defendants' motion to dismiss Count One because the alleged omissions and

misrepresentations are plausibly material to the finding of probable cause.  *See Bologna v.*

*Krasner*, 2025 WL 1762101, at *17 (E.D. Pa. June 25, 2025) (denying motion to dismiss

claim alleging malicious prosecution, noting that "at the motion to dismiss stage, and based

on the reconstructed affidavit, it does not appear that there was probable cause to arrest

Plaintiff for the offenses charged"); *see also Conde-Shenery v. Rodick*, 2020 WL 42048, at

*1 (M.D. Pa. Jan. 2, 2020) (adopting report and recommendation denying motion to dismiss

claim alleging malicious prosecution against Detective David Rodick and City of Hazleton).

### B.   Count Two Alleging *Monell* Liability Against the City of Hazleton for Malicious Prosecution Will Not Be Dismissed.

Defendants next seek to dismiss the *Monell* claim alleged in Count Two against

Defendant City.  (Doc. 13 at 24-33).  According to Defendants, Plaintiffs have failed to

allege sufficient plausible factual content in their *Monell* claim.  Instead, Defendants claim

that the Complaint "simply makes conclusory statements as the existence of alleged

policies, practices, and/or customs of Defendant City." (*Id.* at 29). Defendants further claim

that the Complaint "fails to identify any other instances in which similar constitutional

deprivations occurred" and therefore, "Plaintiffs has failed to sufficiently allege a claim for

*Monell* liability." (*Id.*). The Court disagrees.

"A municipality cannot be held liable for the unconstitutional acts of its employees on

a theory of *respondent superior*." *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 222 (3d Cir.

2014) (emphasis in original) (citations omitted). Under Section 1983, local governments are

responsible only for "their own illegal acts," and "are not vicariously liable ... for their

employees' actions." *Connick v. Thompson*, 563 U.S. 51, 60 (2011). "To state a § 1983

against a municipality, i.e., a *Monell* claim, a plaintiff must allege that (1) he suffered a

constitutional violation and (2) the municipality caused the constitutional violation through a

policy, a custom, or a failure to train or other inadequacy." *Onyiah v. City of Philadelphia*,

660 F. Supp. 3d. 407, 417 (E.D. Pa. 2023) (collecting cases). To ultimately prevail on

a *Monell* claim, a plaintiff bears the burden to "identify a municipal 'policy' or 'custom' that

caused the plaintiff's [constitutional] injury." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown,*

520 U.S. 397, 403 (1997).

The Third Circuit Court of Appeals has further explained that there are "three

situations where acts of government employees may be deemed to be the result of a policy

or custom of the governmental entity for whom the employee works, thereby rendering the

entity liable under §1983." *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 584 (2003).

"The first is where the appropriate officer or entity promulgates a generally applicable

statement of policy and the subsequent act complained of is simply an implementation of

the policy." *Id.* "The second occurs where no rule has been announced as a policy, but

federal law has been violated by an act of the policymaker itself."[11]    *Id.*  The third scenario

occurs "where the policymaker has failed to act affirmatively at all, though the need to take

some action to control the agents of government is so obvious, and the inadequacy of

existing practice so likely to result in a violation of constitutional rights, that the policymaker

can reasonably be said to have been deliberately indifferent to that need." *Id.*

Under the third scenario, "a local government's decision not to train certain employees

about their legal duty to avoid violating citizen's constitutional rights may rise to the level of

an official government policy for purposes of § 1983." *Connick*, 563 U.S. at 60.

However, "[a] municipality's culpability for a deprivation of rights is at its most

tenuous when a claim turns on a failure to train." *Id.*  Where, as here, Plaintiff seeks to

impose liability against Defendant City based on its failure to train, "liability under Section

1983 requires a showing that the failure amounts to 'deliberate indifference' to the rights of

persons with whom those employees will come in contact." *Carter v. City of Philadelphia*,

---

11      A policy is made "when a decisionmaker possess[ing] final authority to establish municipal policy
with respect to the action issues a final proclamation, policy or edict." *Kneipp v. Tedder*, 95 F.3d 1199, 1212
(3d Cir. 1996) (internal citation and quotation marks omitted).  A custom is an act "that has not been formally
approved by an appropriate decisionmaker," but that is "so widespread as to have the force of law." *Bryan
Cnty.*, 520 U.S. at 404.

181 F.3d 339, 357 (3d. Cir. 1999) (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388

(1989)); *see also A.M. ex rel. J.M.K. v. Luzerne Cnty. Juv. Det. Ctr.*, 372 F.3d 572, 582 (3d

Cir. 2004) ("A municipality may be liable for failing to train its employee if that failure

amounts to deliberate indifference. . . . The deficiency in the municipality's training program

must be closely related to the plaintiff's ultimate injuries.").

The "deliberate indifference" standard is "a stringent standard of fault, requiring proof

that a municipal actor disregarded a known or obvious consequence of his action." *Brown*,

520 U.S. at 410.  Ordinarily, this requires a plaintiff to show "[a] pattern of similar

constitutional violations by untrained employees." *Connick*, 563 U.S. at 62.  Indeed, a

"[p]olicymaker's *continued adherence* to an approach that they know or should know failed

to prevent tortious conduct by employees may establish the conscious disregard for the

consequence of their actions–the deliberate indifference–triggering municipal liability.

Without notice that a course of training is deficient in a particular respect, decision makers

can hardly be said to have deliberately chosen a training program that will cause violations

of constitutional rights." *Id.* (emphasis in original).  Even without evidence that the

government entity had an affirmative policy or custom on the matter at issue, evidence that

the government entity "turned a blind eye to an obviously inadequate practice that was likely

to result in the violation of constitutional rights" would suffice.  *Natale*, 318 F.3d at 584.

The Supreme Court has also recognized "single-incident" failure to train liability,

where a pattern of constitutional violations need not be established.  *Canton*, 489 U.S. at

390 n.10.   Under single-incident failure to train liability, deliberate indifference can be

established where the need for training "can be said to be 'so obvious' that failure to do so

could properly be characterized as 'deliberate indifference' to constitutional rights" even

absent a pattern of constitutional violations.  *Id.*  Nonetheless, single-incident failure to train

liability is extremely narrow. *See id.* at 391 ("[P]rov[ing] that an injury or accident could have

been avoided if an [employee] had better or more training, sufficient to equip him to avoid

the particular injury-causing conduct," is insufficient to establish single-incident failure to

train liability).

In addition to establishing deliberate indifference, Plaintiff must also demonstrate that

the identified deficiency is "closely related to the ultimate [constitutional] injury.'" *Colburn v.*

*Upper Darby Twp.*, 946 F.2d 1017, 1028 (3d Cir. 1991) (alterations in original) (quoting

*Canton*, 489 U.S. at 391).  The operative inquiry to establish causation, therefore, rests on

whether "the injury [could] have been avoided had the employee been trained under a

program that was not deficient in the identified respect." *Canton*, 489 U.S. at 391.  Although

causation must be proven separately from deliberate indifference, "[t]he high degree of

predictability [in a single-incident case] may also support an inference of causation—that the

municipality's indifference led directly to the very consequence that was so predictable."

*Thomas*, 749 F.3d at 226 (quoting *Brown*, 520 U.S. at 409-10).

Here, the Court finds that the Complaint states a plausible section 1983 claim

against the Defendant City of Hazleton.  Contrary to Defendants assertions, there is nothing

conclusory about the allegation contained in Count Two of the Complaint.  Plaintiffs have plausibly alleged facts, which the Court must accept as true, raising the reasonable inference that Defendant City had a custom and failed to train its officers on "probable cause to initiate criminal proceeding, the continuing obligation to evaluate the existence of probable cause, reliability of witnesses, and criminal investigation." (Doc. 17 at 23-24). There can be no doubt the municipal policymakers knew that their police officers' employees would confront a particular situation (i.e, drafting affidavits of probable cause, arrests warrants, and initiating criminal proceeding by way of criminal complaints). Moreover, the allegations of the Complaint plausibly demonstrate that "the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Carter*, 181 F.3d at 357.  Indeed, the failure to train its employees on probable cause to initiate criminal proceedings, the continuing obligation to evaluate the existence of probable cause to initiate criminal proceedings, and the reliability of witnesses will frequently cause of deprivation of constitutional rights.

In addition, the Complaint alleges the following policies, practices and/or customs:

- Omitting and/or mispresenting facts in affidavits of probable causes, thereby depriving the judicial reviewer of the opportunity to properly assess probable cause;

- Choosing not to interview eyewitnesses to a crime when such testimony may undermine probable cause;

- Failing to assess the credibility of witnesses/victims and adopting their interpretation of events as truth even where the physical evidence contradicts their version;

- Omitting facts about the credibility of a witness from affidavits of probable cause where such facts would undermine the veracity of the witness's statements;

- Failing to investigate crimes charged even when the information is readily accessible;

- Choosing to continue to prosecute crimes where there was no probable cause initially or any previously existing probable cause had dissipated;

- Taking steps to withhold evidence from criminal defense counsel and/or interfere with criminal defense counsel's access to evidence;

- Placing concerns about securing convictions over the constitutional rights of suspects and criminal defendants; and

- The failure to train its police personnel on probable cause to initiate criminal proceedings, the continuing obligation to evaluate the existence of probable cause, reliability of witnesses, and criminal investigations.

(*Id.*, ¶ 270(a)-(i)).

In this matter, the Court finds that Plaintiffs have plausibly alleged that the policymaker for the Defendant City is Police Chief of Hazleton Brian Schoonmaker and that the alleged custom caused the Plaintiffs' injuries. (Doc. 1-2, ¶¶ 264-269, 271); *see Donahue v. Borough of Collingdale*, 714 F. Supp. 3d 504, 521 n.21 (E.D. Pa. 2024) ("municipal police chiefs are plausibly final policymakers when they promulgate training

materials and retain authority to evaluate and control officers' conduct") (citations omitted);

*see id.* ("But more importantly, in custom and failure to train cases, in contrast to official

policy claims, Pennsylvania police chiefs are routinely the relevant policymaker because of

their determinative role in running the department.") (citations omitted).  Moreover, a

"plaintiff is not obligated to plead with special particularity the exact policies and practices

that were in place, prior to take any discovery into the alleged policies, and explain exactly

how these precisely alleged policies cause or contributed to" the plaintiff's injuries.  *Reed v.

City of Philadelphia*, 2021 WL 2529915, at *3 (E.D. Pa. June 17, 2021) (internal citation and

quotation marks omitted); *see also Cowher v. Pike Cnty. Corr. Facility*, 2018 WL 2717992,

at *4 (M.D. Pa. June 6, 2018) ("Pleading standards do not require a plaintiff to recite the

specific text of official policy.").

    Further, Plaintiffs have alleged sufficient plausible factual content to proceed on their

claims alleging failure to train.  *See Brizzy v. Luzerne Cnty. Children & Youth Servs.*, 2019

WL 3948783, at *5 (M.D. Pa. Aug. 20, 2019) ("the claims in the Amended Complaint, when

viewed all together and construed in a manner most favorable to Plaintiff, sufficiently plead

a plausible failure to train claim."); *see also Estate of Roman v. City of Newark*, 914 F.3d

789, 798 (3d Cir. 2019) ("The pleading requirements are different for failure-to-train claims

because a plaintiff need not allege an unconstitutional policy.").  Moreover, Plaintiffs

plausibly allege deliberate indifference and causation.  (Doc. 1-2, ¶¶ 272-275); *see

Donahue*, 714 F. Supp. 3d at 516 ("With failure to train, the frequency of a recurring

situation and predictability that an officer will respond improperly without adequate training establishes causation."). Although Defendants quibble that Plaintiffs have not identified any pattern of similar constitutional violations, (Doc. 13 at 30), they need not do so when pursuing a single-incident failure to train claim.[12] *Canton*, 489 U.S. at 390 n.10. Therefore, Defendants' motion to dismiss Count Two alleging *Monell* liability against Defendant City will be denied.

### C. Pennsylvania's Political Subdivision Tort Claims Act Does Not Bar the Plaintiffs State Law Claim for Malicious Prosecution.

Defendants next move to dismiss the Plaintiffs state law claim for malicious prosecution alleged in Count Five against the Individual Defendants, claiming that they are protected from this claim due to immunity under the Pennsylvania Political Subdivision Tort Claim Act, 42 Pa. C.S.A. § 8541 *et. seq* ("PSTCA"). (Doc. 13 at 33-36). Further, Defendants claim that this count must be dismissed because the Individual Defendants are only being sued in their official capacity. (*Id.* at 35-36). Plaintiffs counter that the Individual Defendants are being sued in their individual capacity and no immunity exists under the Act's willful misconduct exception, 42 Pa. C.S.A. § 8550. (Doc. 17 at 24-25).

As an initial matter, the Court agrees with the Plaintiffs that the Individual Defendants are not being sued in their official capacities on this claim. Nowhere in the Complaint do

---

[12] The Court notes that this is not the first time Defendant Rodick and Defendant City of Hazleton have been sued in this Court on a claim alleging malicious prosecution. *See Conde-Shenery*, 2020 WL 42048 at \*1 (adopting report and recommendation denying motion to dismiss claim alleging malicious prosecution against Detective David Rodick and City of Hazleton).

Plaintiffs make any distinction between individual and official capacities; the Complaint is

silent on this issue.  Thus, the question before the Court is whether Plaintiffs' Complaint

plausibly alleges "willful misconduct" or "actual malice" to allow this claim to proceed to

discovery.  *See Sanford v. Stiles*, 456 F.3d 298, 315 (3d Cir. 2006) ("However, there is an

exception to this general rule:  Employees are not immune under § 8545 where their

conduct amounts to 'actual malice' or 'willful misconduct') (citing 42 Pa. C.S.A. § 8550)).

Pursuant to the PSTCA, "[a]n employee of a local agency is liable for civil damages

on account of any injury to a person of property caused by acts of the employee which are

within the scope of his office or duties only to the same extent as his employing local

agency."  42 Pa. C.S.A. § 8455.  "Local agencies, in turn, enjoy broad immunity from tort

liability subject to eight exceptions that are not applicable to this case."  *Occhipinti v. Bauer*,

2017 WL 3495182, at *13 (M.D. Pa. Aug. 14, 2017) (citations omitted).

42 Pa. C.S.A. § 8550 provides:

> In any action against a local agency or employee thereof for damages on account of
> an injury caused by the act of the employee in which it is judicially determined that the
> act of the employee caused the injury and that such act constituted a crime, actual
> fraud, actual malice or willful misconduct, the provisions of sections 8454 (relating to
> official liability general), 8546 (relating to defense of official immunity), 8548 (relating
> to indemnity) and 8549 (relating to limitation on damages) shall not apply.

(*Id.*).  "An employee's immunity does not extend to acts that are judicially determined to be

crimes, actual fraud, actual malice, and willful misconduct."  *Renk v. City of Pittsburgh*, 537

Pa. 68, 641 A.2d 289, 292 (Pa. 1994).  The Pennsylvania Supreme Court has defined

"willful misconduct" as "conduct whereby the actor desired to bring about the result that

followed or at least was aware that it was substantially certain to follow, so that such desire can be implied." *Id.* at 293.

"[T]o prove a malicious prosecution claim under Pennsylvania law, a plaintiff must show that the defendant "instituted proceedings against the plaintiff 1) without probable cause, 2) with malice, and 3) the proceedings must have terminated in favor of the plaintiff.'" *Zimmerman*, 873 F.3d at 418 (quoting *Kelley v. Gen. Teamsters, Chauffeurs & Helpers Local Union 249*, 518 Pa. 517, 544 A.2d 940, 941 (1988)). Moreover, immunity under the PSTCA is an affirmative defense. *See Ferrone v. Onorato*, 439 F. Supp. 2d 442, 455 (W.D. Pa. 2006) ("The defense of official immunity is an affirmative defense which must established by the defendants."). The Court may grant Defendants' motion to dismiss on their affirmative defenses of immunity under the PSTCA "only where an affirmative defense appears (i.e., is established) on the face of the complaint." *O'Donnell v. Knott*, 283 F. Supp. 3d 286, 294 (E.D. Pa. 2017).

At this early stage of the proceeding, the Court finds that Plaintiffs have alleged sufficient plausible facts which, if true, would not entitle the Individual Defendants to claim immunity under the PSTCA. (Doc. 1-2, ¶¶ 78-87, 92-93, 252-255, 295-297, 303-309, 312). Courts in this Circuit routinely deny motions to dismiss based on immunity under the PSTCA where, as here, the Complaint plausibly alleges factual content which, if true, would not entitle the Individual Defendants to immunity under the PSTCA because the actions may plausibly be seen as malicious or arise to the level of willful misconduct. *See, e.g., Payne v.*

71

*Cnty. of Delaware*, 2025 WL 2969120, at *9 (E.D. Pa. Oct. 17, 2025) ("The PSTCA does not protect public employees from liability in their personal capacity where the alleged torts involved malicious or willful conduct."); *Walton v. Corvi*, 2025 WL 1256402, at *7 (E.D. Pa. Apr. 30, 2025) (denying motion to dismiss, noting that because "the Amended Complaint sufficiently pleads malicious prosecution, the Court cannot apply PSTCA immunity at this stage."); *O'Donnell*, 283 F. Supp. 3d. at 306 ("I conclude that Plaintiff has pled sufficient facts at this stage to plausibly suggest that the Defendants' alleged misconduct was 'willful'" within the meaning of the Torts Claims Act."); *Occhipinti*, 2017 WL 3495182, at *13 (denying police officer immunity under PSTCA, noting "[i]f Detective Bauer did indeed place information in her affidavit of probable cause that she knew was false in an attempt to establish probable cause, this would constitute willful behavior not protected by official immunity."); *Tarbox v. Butler Twp.*, 2015 WL 6157173, at *12 (M.D. Pa. Oct. 19, 2015) ("Other courts have found that false arrest, false imprisonment, malicious prosecution, and intentional infliction of emotional distress, are intentional torts amounting to actual malice or willful misconduct and therefore fall within the ambit of § 8550. . . . All of Plaintiffs' claims are thus either federal civil rights causes of action to which the PSTCA does not apply or state-law intentional torts perpetrated by a local government employee which are excluded from immunity under section 8550.") (citations omitted).  For these reasons, Defendants' motion seeking dismissal of Count Five will be denied.

### D.   The Claims Against Detective Howey Will Not Be Dismissed.

Defendants next seek dismissal of Count One alleging malicious prosecution and

Count Four alleging false arrest and false imprisonment against Detective Howey.  (Doc. 13

at 36-38).  According to Defendants, all claims against Detective Howey must be dismissed

because there are no allegations in the Complaint that Defendant Howey was involved in

the Plaintiffs arrest and prosecution.  Specifically, Defendants claim that the Affidavits of

Probable Cause were "not signed by Defendant Howey" and Plaintiffs allege no "facts to

support that Defendant Howey provided alleged misrepresentations to be included in the

Affidavits of Probable Cause."  (*Id.* at 37-38).  Plaintiffs counter that "[w]hile the Hazleton

Defendants are correct that Plaintiffs do not allege that Defendant Howey signed the

Affidavits of Probable Cause, they conveniently leave out of their argument Plaintiffs'

allegations that Defendant Howey signed the criminal complaints which initiated the charges

against Plaintiffs and that he signed the applications for arrest warrants."  (Doc. 17 at 25)

(citing Doc. 1-2, ¶¶ 74-76, 99-101).

In order to render Howey liable under section 1983, Plaintiffs "must show that he

participated in violating their rights, or that he directed others to violate them."  *Baker v.

Monroe Twp.*, 50 F.3d 1186, 1190 (3d Cir. 1995).  Initially, the Third Circuit has held that if

"the officers influenced or participated in the decision to institute criminal proceedings, they

can be liable for malicious prosecution."  *Halsey v. Pfeiffer*, 750 F.3d 273, 297 (3d Cir.

2014).  "In the context of statements made by fellow officers, the Third Circuit has held that

probable cause can be based on a fellow officer's statement only if the statement is

supported by actual facts that satisfy the probable cause standard." *Vanderklok*, 140 F.

Supp. 3d at 382 (citations omitted). "Thus, it was insufficient for the officers to rely on bare

statements from other officers that an arrest warrant existed for an individual without

additional facts and circumstances to support an independent finding of probable cause."

*Id.*

Malicious prosecution, false arrest, and false imprisonment are separate and distinct

claims.[13] "Although [these] claims arise out of the Fourth Amendment's guarantee against

unreasonable seizures, the seizures they concern are different in substance and duration."

*Rivera-Guadalupe v. City of Harrisburg*, 124 F.4th 295, 308 (3d Cir. 2024). "As the

Supreme Court has explained, claims for false arrest challenge 'detention without legal

process,' *Wallace v. Kato*, 549 U.S. 384, 389 (2007), while malicious prosecution involves

seizure 'pursuant to legal process.'" *Id.* (quoting *Thompson v. Clark*, 596 U.S. 36, 42

(2022)). "Malicious prosecution differs from false arrest inasmuch as a claim for false

arrest, unlike a claim for malicious prosecution, covers damage only from the time of

---

[13]    "False arrest and false imprisonment causes of actions are intertwined." *Craig v. Collins*, 2013 WL
5271521, at *5 (E.D. Pa. Sept. 17, 2013). "To state a claim for false arrest under the Fourth Amendment, a
plaintiff must establish: (1) that there was an arrest; and (2) that the arrest was made without probable
cause." *James v. City of Wilkes-Barre*, 700 F.3d 675, 680 (3d Cir. 2012) (citing *Groman*, 47 F.3d at 634).
"To state a claim for false imprisonment, a plaintiff must establish (1) that she was detained; and (2) that the
detention was unlawful." *Id.* at 682-83. "A false imprisonment claim under § 1983 which is based on an
arrest made without probable cause in grounded in the Fourth Amendment's guarantee against unreasonable
seizures." *Groman*, 47 F.3d at 636.

detention until the issuance of process or arraignment, and not more."[14]  *Johnson v. Knorr*, 477 F.3d 75, 82 (3d Cir. 2007) (internal citations and quotation marks omitted).

Here, the Court cannot say that Defendant Howey must be dismissed from this action at this early stage of the proceedings.  Plaintiffs have alleged sufficient plausible factual content, which the Court accepts as true, to permit them to maintain their claim against Detective Howey for malicious prosecution, false arrest, and false imprisonment. Although Plaintiffs do not allege that Defendant Howey signed the Affidavits of Probable Cause, they do allege that Defendant Howey signed the Criminal Complaint which initiated the criminal proceedings against Plaintiffs and that Defendant Howey signed the application for arrests warrants and was otherwise personally involved in the alleged constitutional deprivation.  (Doc. 1-2, ¶¶ 19-28, 49-56, 74-76, 99-101, 248-255).  Thus, Plaintiffs have plausibly alleged that Defendant Howey directly participated in the violation of their constitutional rights and/or acquiesced in the other Individual Defendants violation of Plaintiffs' constitutional rights.   Accordingly, the Court will deny Detective Howey's motion to dismiss Count One and Count Four.

---

[14]    Plaintiffs have alleged a violation of both the Fourth and Fourteenth Amendments.  It is unclear to the Court whether Plaintiffs are pursuing a separate and distinct due process claim or merely cite the Fourteenth Amendment as incorporating the Fourth Amendment against the states.  The parties do not address the distinction, and Defendants did not raise it in their motion to dismiss.  Accordingly, the Court will not address this issue.

**E.    Paragraph 1 of the Complaint Will Not Be Stricken**

Finally, Defendants next move to strike Paragraph 1 of the Complaint pursuant to

Federal Rule of Civil Procedure 12(f), claiming that this paragraph "fails to conform with the

pleading require[ments] under the Federal Rule of Civil Procedure and should be stricken."[15]

(Doc. 13 at 38).   It is well-settled that striking a pleading is a "drastic remedy" which courts

generally disfavor.  *Homesite Ins. Co. of Midwest v. Geaith*, Civil No. 1:22-CV-1664, 2023

WL 362387, at *1 (M.D. Pa. Jan. 30, 2023); *see also Balon v. Enhanced Recovery Co., Inc.*,

316 F.R.D. 96, 98 (M.D. Pa. 2016) (motions to strike "should be denied unless the

allegations have no possible relation to the controversy, may cause prejudice to one of the

parties, or confuses the issues."); *Fiorentino v. Cabot Oil & Gas Corp.*, 750 F. Supp. 2d 506,

509 (M.D. Pa. 2010) ("Relief under Federal Rule of Civil Procedure 12(f) is generally

disfavored, and will be denied unless the allegations have no possible relation to the

controversy and may cause prejudice to one of the parties, or if the allegations confuse the

issues in the case.").

"The burden rests with the moving party to show that the challenged matter should

be stricken."  *Roamingwood Sewer & Water Ass'n v. Nat'l Diversified Sales, Inc.*, 509 F.

Supp. 3d 198, 204 (M.D. Pa. 2020).  Accordingly, Defendants "must demonstrate that the

matter falls within the categories listed in Rule 12(f)."  *Id.*  "Immaterial matter is that which

---

[15]    In their motion, the Defendants claim they seek a more definite statement pursuant to Federal Rule
of Civil Procedure 12(e). However, Defendants' brief is silent on this issue. Accordingly, the Court finds that
Defendants have abandoned this issue by failing to raise in it their brief.  Moreover, the Court cannot
determine what, if anything, Defendants seeks a more definite statement about.

has no essential or important relationship to any claims for relief." *Id.* "Impertinent matter consists of statements that do not pertain, and are not necessary, to the issues in question." *Id.* "And scandalous matter is that which casts a derogatory light on someone, uses repulsive language, or detracts from the dignity of the court." *Id.* "Even where the challenged material is redundant, immaterial, impertinent, or scandalous, a motion to strike should not be granted unless the presence of the surplusage will prejudice the adverse party." *Pennington v. Wells Fargo Bank, N.A.*, 947 F. Supp. 2d 529, 534 (E.D. Pa. 2013) (internal citations and quotation marks omitted).

As an initial matter, Defendants do not argue that they are prejudiced by the inclusion of the Paragraph 1 of the Complaint.  In similar circumstances, Courts routinely deny motions to strike where the party moving to strike has not attempted to show prejudice.  *See, e.g., Balliet v. Luzerne Cnty.*, 2024 WL 2275252, at *10 (M.D. Pa. May 20, 2024) (denying motion to strike introductory paragraph of the complaint, finding that "while the Complaint's introductory paragraphs could be interpreted as argumentative and are largely repetitive of the claims set forth in the Complaint, the paragraphs are undoubtedly relevant to the case as a whole"); *Hatcher v. Hauffman*, 2021 WL 3084921, at *2 (W.D. Va. July 21, 2021) ("Although the introductory paragraphs may be redundant and unnecessary, Defendants have not shown that this section is so prejudicial that it should be stricken under Rule 12(f)."); *Ware v. Hosp. of the Uni. of Pennsylvania*, 2015 WL 5729243, at *4 (E.D. Pa. Sept. 29, 2015) ("In short, based on Defendants' inability to point to any risk of confusion or

prejudice from either the Introduction section or the photographs, Defendants' Motion to Strike is denied.").

In short, Defendants have not overcome the general judicial disfavor for striking pleadings and Plaintiffs' allegations which Defendants seek to strike are simply not "immaterial, redundant, impertinent, or scandalous" as required by Rule 12(f).  Nor have Defendants claimed any prejudice as a result of Paragraph 1 inclusion in the Complaint. And Defendants do not claim that they are unable to adequately respond to Paragraph 1 or the Complaint.  Therefore, the Court will deny Defendants' motion to strike Paragraph 1 of the Complaint.

## V.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss and motion to strike will be denied in their entirety.  A separate Order follows.

Robert D. Mariani
United States District Judge